[Nos. 33500-0-II; 33504-2-II; 33510-7-II.    Division Two.    September 20, 2006.]

*In the Matter of the Welfare of* C.B.

*In the Matter of the Welfare of* C.R.B.

*In the Matter of the Welfare of* T.A.B.

*William E. Morgan*, for appellant.

*H. Steward Menefee, Prosecuting Attorney*, and *Jennifer L. Wieland, Deputy*, for respondent.

¶1 BRIDGEWATER, J. — Angelynn Bartman appeals from orders terminating her parental rights over her three children. We hold that Bartman overcame the rebuttable presumption that she could not improve her parental deficiencies because she completed a chemical dependency program and had a recent positive visitation with her children. And the State did not present any evidence that at the time of the termination hearing Bartman's residence was unsafe. The State also conceded that she was improving, but it failed to provide any evidence that Bartman could not improve within six months to a year from the date of the termination hearing. We thus hold that the State failed to meet its burden of proof. Because the issue may arise in later proceedings, we also hold that the trial court properly ruled that the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, did not apply. We reverse and order the trial court to vacate the termination order. But our decision does not void the dependency petition or prevent the State from filing another petition to terminate.

## FACTS

¶2 Angelynn Bartman is the mother of three children, C.B., born September 19, 1997; C.R.B., born February 16,

2001; and T.A.B., born April 18, 2003. As a result of several referrals, the State removed the children from Bartman's custody on September 5, 2003, and had the three children declared dependent on November 4, 2003. In December 2004, one year and three months after the State removed her children from her custody, the State filed a termination petition.

¶3 Because Bartman concedes that she was an unfit parent when the Department of Social and Health Services (DSHS) removed her children, we focus on the facts relating to whether Bartman's parenting ability later improved. After DSHS intervened, the State recommended that Bartman take advantage of several services. For example, Bartman's social worker referred her to parenting and anger management classes.

¶4 Although her performance was less than ideal, Bartman eventually completed two parenting classes. In the first, which started in October 2003 and was taught by Roxane Johnson, Bartman received a certificate of completion. But Johnson remained concerned about Bartman's parenting skills and worried that Bartman failed to incorporate anything she had learned. The second class ran from April to May 2004. Bartman was chronically late and did not do all of her homework. Nonetheless, she completed the class.

¶5 Bartman was more dilatory in seeking anger management. Although her social worker referred her to an anger management class in November 2003, Bartman initially made no effort to attend. She finally began a course in October 2004, almost one year later, but did not finish because she had to seek drug treatment. She explained that she did not finish the class because after she got out of the drug program, the anger management class had discontinued its grant with the State and she could no longer afford it. Although Bartman did not complete an anger management class, she was enrolled in a class scheduled to begin in May 2005, the month after the termination hearing.

¶6 Bartman's biggest parenting deficiency seems to have involved drugs and alcohol. In fact, the event that precipitated the State's dependency petition was a drug test revealing Bartman was using methamphetamine. At the termination hearing, she admitted that she had used methamphetamine and alcohol in the past. She testified that her methamphetamine use was off and on before August 2003, but she denied use after that.

¶7 Her alcohol use eventually led her into the criminal justice system. On July 4, 2004, she was arrested for driving under the influence (DUI). On October 31, she was arrested for a second DUI and felony eluding a police officer. She pleaded guilty to the felony eluding charge to avoid her misdemeanor charges. As a result of this conviction, she had to attend an inpatient alcohol treatment program.

¶8 Bartman's progress in battling her drug and alcohol problems was initially slow. The State referred Bartman to Robert Udd, a chemical dependency counselor, in September 2003. In his initial meetings with her, Udd did not recommend drug treatment because she denied use. He repeated his assessment in March 2004 but still did not recommend treatment because she continued to deny use.

¶9 But after her DUI arrests, by all accounts, Bartman was very successful in battling her addiction. In lieu of going to jail, she entered a drug treatment program. Her counselor reported that her progress was remarkable. After getting out of the inpatient program, she entered an outpatient treatment program in February 2004 and had almost completed a 90-day program when the termination hearing took place. According to her counselor there, she has been doing "[w]onderfully" and was positive and focused. Report of Proceedings (RP) (Apr. 28, 2005) at 65. The counselor indicated that her prognosis was good. Bartman also reported that she had begun attending Alcoholics Anonymous (AA) classes and even chaired the meetings. A member of her AA group testified that she had progressed in their program. And, according to her social worker, Bartman did not fail any drug screens after August 2003.

¶10 In addition to her anger and drug problems, the State introduced testimony that Bartman's visitation with her children during the dependency was indicative of bad parenting. After the State placed the children in foster care, Bartman had supervised visits with them. The State presented several witnesses who testified that the visitations were very stressful. In particular, the visitation supervisors felt that Bartman persisted in bringing unhealthy snacks, did not listen to suggestions, and paid more attention to T.A.B., her son and youngest child, than her two older daughters. They also reported that Bartman would not keep a schedule when ending the visits, hanging on to the children and making them cry.

¶11 One of the visitation supervisors, Kim Burdick, stopped supervising visits so that she could be a foster parent for all three children. Burdick testified that she and her husband would adopt the children if Bartman's rights were terminated. She also indicated that the two daughters had told her and her husband that they wanted to be adopted by the Burdicks and that they spoke of it often. Burdick also told the trial court that the children call her "[m]ommy" and Bartman "visit mom." RP (Apr. 28, 2005) at 23, 24.

¶12 The State's expert witness, Betty Danielson, testified that she observed one of Bartman's visits a week before the termination hearing and thought her interactions with her children were totally appropriate. The children did not display reactive attachment or oppositional defiance. And Danielson conceded that she could not predict how harmful continued foster care might be.

¶13 Danielson also testified that she began treating the older children in August 2004 and reported that their behavior had not been improving over the course of her treatment from August 2004 to April 2005. She stated that the children needed structure, consistency, and a sense of permanency. According to Danielson, if they continued moving from placement to placement, the children's development would be negatively impacted. She further indi-

cated that the children were bonded in their current placement with Burdick, that she observed more physical comforting when the children were with the foster family, and that the children more often mentioned their social worker and Burdick than Bartman.

¶14 Despite her improvement after her DUI arrests, the State maintained that Bartman was still not trustworthy as a parent. Natalie McLaughlin, Bartman's assigned social worker since November 2003, testified at the hearing that while Bartman recently finished her drug treatment programs, she had turned down multiple opportunities to correct her parental deficiencies, falsified information in her evaluations, and refused to take responsibility for her actions. For example, Bartman did not tell McLaughlin about her DUI convictions; McLaughlin learned about them from Bartman's mother after Bartman was already in jail. McLaughlin also told the court that even if Bartman had kicked her drug habit, she still needed to work on anger management and would have to demonstrate that she was clean and sober and that she could provide a safe home.

¶15 In addition to testimony about Bartman's parental deficiencies, the State also sought to establish that the children were not Native American.[1] During the termination process, Bartman alleged that her children were members of the Cherokee or Sioux tribes. As a result, her social worker notified all of the federally recognized Cherokee and Sioux tribes. All of the tribes either responded that Bartman and her children were not members of their tribes or failed to respond after a second notice the State sent via certified mail. The State ended its efforts to determine whether Bartman and her children were members of a Cherokee or Sioux tribe after the Local Indian Children Welfare Advisory Committee (LICWAC) recommended ending the search.

---

[1] Under federal law, a state must prove beyond a reasonable doubt that continued parental custody of the child is likely to result in serious emotional or physical damage to the child in order to terminate an Indian parent's parental rights. 25 U.S.C. § 1912(f).

¶16 After the April 2005 termination hearing, the trial court ordered Bartman's parental rights terminated. The trial court found that the children were not members of Indian tribes. It also found that although Bartman had accepted some services, she continued to make poor choices. The trial court determined that Bartman's visits had gone poorly and were difficult for the children.

¶17 In contrast, the trial court found that the children were bonded in their foster family and were doing well. It also found that termination was in the children's best interests, that a six-month to a year period was a significant time in the children's lives, and that the children needed permanency. The trial court made no findings about how long it would take Bartman to be reunited with her children.

## ANALYSIS

■ ¶18 Termination proceedings require the courts to engage in the difficult task of balancing two compelling interests: a parent's fundamental liberty interest in the care and custody of her children and the State's obligation to protect the basic safety and health of the children. As Division One of this court has recently noted, it is " 'no slight thing to deprive a parent of the care, custody, and society of a child.' " *In re Dependency of T.L.G.*, 126 Wn. App. 181, 198, 108 P.3d 156 (2005) (quoting *State v. Rasch*, 24 Wash. 332, 335, 64 P. 531 (1901)).

■■ ¶19 But the State has an urgent parens patriae interest in providing the child with a safe, stable, and permanent home and a speedy resolution to termination proceedings. *In re Dependency of T.R.*, 108 Wn. App. 149, 159, 29 P.3d 1275 (2001). And our legislature has declared that in Washington, where the parents' legal rights and a child's right to basic nurture, physical and mental health, and safety conflict, the child's rights and safety should prevail. RCW 13.34.020.

■ ¶20 To reconcile these competing interests, the legislature and courts have created a two-step process. First, the State must prove six statutory elements in RCW 13.34-.180(1) by clear, cogent, and convincing evidence. RCW 13-.34.190(1)(a); *In re Dependency of H.W.*, 92 Wn. App. 420, 425, 961 P.2d 963 (1998). To meet this burden, the State must show that the ultimate fact in issue is " 'highly probable.' " *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). The two elements at issue in this case are:

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .

. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1)(e)-(f). Establishing these statutory factors, and factor (e) in particular, by clear, cogent, and convincing evidence, also satisfies constitutional due process for terminating a parent's fundamental liberty interest. *In re K.R.*, 128 Wn.2d at 142.

¶21 After the State establishes the statutory factors by the requisite burden of proof, the State must then prove that termination is in the children's best interests. RCW 13.34.190(2), *In re T.L.G.*, 126 Wn. App. at 197. The State need prove that termination is in the children's best interests only by a preponderance of the evidence. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 571, 815 P.2d 277 (1991). But we turn our attention to the children's best interests only after the State has met its burden on the six statutory factors. *In re H.W.*, 92 Wn. App. at 425.

■ ¶22 In termination proceedings, the trial court has the advantage of having the witnesses before it, and therefore we accord deference to the trial court's decision. *In re K.R.*, 128 Wn.2d at 144. Accordingly, we limit our review to

determining whether substantial evidence supports the trial court's findings in light of the applicable burden of proof. *In re H.W.*, 92 Wn. App. at 425. Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the declared premise. *Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986), *cert. dismissed*, 479 U.S. 1050 (1987). In this review, we do not make credibility determinations and we do not weigh the evidence. *In re A.V.D.*, 62 Wn. App. at 568.

## I. Likelihood that Conditions Will Be Remedied

¶23 The main thrust of Bartman's argument on appeal is that the evidence does not support the trial court's finding that there was little likelihood that her parental deficiencies could be remedied in the near future. She argues that although her behavior up to November 2004 warranted state intervention, she had steadily improved since then and that the State failed to prove she could not be reunited with her children. The State nonetheless maintains that Bartman's track record until November 2004 supports the trial court's finding that there was little likelihood Bartman could be reunited with her children in the near future.

¶24 We agree with Bartman. We hold that where a parent produces evidence that she has been improving over a four-month period after the State files a termination petition but before the termination hearing, the State may not rely solely on past performance to prove that it is highly probable that there is little likelihood that the parent will be reunited with her children in the near future.

¶25 We begin by noting that the trial court, to whom we give great deference, apparently felt that Bartman was capable of improving. The trial court reasoned that "[t]he likelihood is that [Bartman] will, and has the ability, to put all of this behind her, but the time frame does not allow it." RP (Apr. 29, 2005) at 49. In other words, the trial court appeared to believe that Bartman's improvement after her DUI arrests was genuine. The only issue seems to have been whether her improvement was too late.

■ ¶26 Because the trial court focused on the time frame of Bartman's improvement rather than the fact of her improvement, we must first turn to the trial court's application of the phrase "near future." RCW 13.34.180(1)(e). What constitutes "near future" depends on the age of the child and the circumstances of the child's placement. *In re T.L.G.*, 126 Wn. App. at 205.

¶27 Here, the trial court entered a finding as to each of the children that

> A six month's or a year's period in a child's life as young as [the child] is a significant period of time. The earlier in life that a child can establish permanency is in the best interest of the [child.]

1 Clerk's Papers (CP) at 16; 2 CP at 14; 3 CP at 18.[2]

■ ¶28 There is evidence in the record to suggest that six months to a year's time frame is appropriate. The child's therapist testified that the children would be developmentally impacted if they waited another year in foster care. She also indicated that in an unhealthy environment, six months would seem like forever. The overriding theme of the therapist's testimony was that the children needed a sense of permanency. And since November 2004, the children had lived with the Burdicks and were bonded in that placement. This is sufficient evidence to convince a reasonable trier of fact that it is highly probable that the children needed a permanent placement within six months to a year.

■ ¶29 Thus, the only remaining question is whether there was substantial evidence to support the trial court's determination that Bartman would not remedy her parental deficiencies within that time. The parties agree to the basic set of facts here. Until November 2004, Bartman was an unfit parent who did not take advantage of the services that the State offered her. After that point, she did begin taking advantage of the State-offered services and was progressing.

---

[2] For the purpose of this opinion, 1 CP refers to the Clerk's Papers for superior court cause number 04-7-00559-5, 2 CP refers to the Clerk's Papers for superior court cause number 04-7-00573-1, and 3 CP refers to Clerk's Papers for superior court cause number 04-7-00574-9.

The legal question we must answer is whether a year and a few months of failing to improve as a parent is substantial evidence to make it highly probable that she would not improve enough to be reunited with her children within the next year.

¶30 In answering this question, we first note that the statute creates a rebuttable presumption:

A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional[3] order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided.

RCW 13.34.180(1)(e).

¶31 It is evident the presumption applies to this case. The State removed the children in September 2003, and the court declared the children dependent in November 2003. More than one year had passed when the State filed its termination petition in December 2004. And Bartman does not dispute that she was offered services several times before and after the dependency began.

¶32 Having decided the presumption applies, we hold that because it implicates a parent's constitutional rights, this presumption shifts only the burden of production to the parent. This is the general rule for presumptions. 2 Mc-CORMICK ON EVIDENCE § 344, at 445 (John W. Strong ed., 5th ed. 1999). It is inappropriate to shift the ultimate burden of persuasion where a parent's constitutional rights are at stake. *See Santosky v. Kramer*, 455 U.S. 745, 769, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (holding that the constitution requires the State to prove the necessary factual elements by clear and convincing evidence). Thus,

---

[3] RCW 13.34.130(1) requires the court to enter a dispositional order after a dependency hearing. The dispositional order, therefore, is the same as the order placing the children in foster care.

even though the presumption applies, the State retains the burden of convincing the court that it is highly probable that Bartman would not have improved in the near future.

¶33 Here, Bartman met her burden to produce evidence that she was improving. As we noted in the fact section, the State's immediate justification for removing the children from Bartman's care was her drug use. But she completed her chemical dependency programs and presented evidence from her counselors and friends that her prognosis was good and that she was a different person. And the State conceded at trial that:

> [W]e all agree that it appears that she is doing what she is supposed to be doing, she has engaged in treatment. By all testimony it appears that she is maintaining in her after care program and that she is doing meetings.

RP (Apr. 29, 2005) at 37. Thus, we hold that Bartman rebutted the statutory presumption. We must therefore evaluate if the evidence produced at the hearing was sufficient to convince a rational trier of fact that it was highly probably that Bartman would not improve conditions within six months to a year.

¶34 Instead of arguing that Bartman is not currently remedying her parental deficiencies, the State argued that "she still would have a long ways to go." RP (Apr. 29, 2005) at 37. We find it very significant, however, that the State failed to introduce any evidence indicating that it would take Bartman more than a year to improve enough to be reunited with her children.

¶35 After a close review of the record, the only testimony the State presented regarding how long it would take Bartman to be reunited with her children came from Bartman's social worker, McLaughlin. According to McLaughlin, Bartman "would again need to engage in anger management services, continue to demonstrate that she's clean and sober . . . to have a safe and stable home, free of safety hazards." RP (Apr. 28, 2005) at 41-42.

¶36  But this testimony does not establish that it would take Bartman more than a year to satisfy these requirements. Bartman completed the recommended parenting classes. She had completed her inpatient drug treatment, and there is no indication that her outpatient care would prohibit her from having custody of the children.

¶37  Nor is there any testimony in the record that Bartman's current residence was unsafe, even though it had been in the past. At the time of the termination hearing, she was living with her mother, and there is no indication that her mother's house was unsafe for children. Presumably, the State could have monitored the house for six months to determine if Bartman remained sober and her house was safe. The State's concern that Bartman had a long way to go, while valid, does not show how long it would take Bartman to be reunited with her children. Had McLaughlin testified that DSHS required a significant period of time of sobriety before returning the children, the result may have differed. But McLaughlin's testimony at this hearing alone was insufficient.

¶38  The only outstanding service was anger management. But according to the State's attorney, anger management class takes 12 weeks. As she was scheduled to begin a class a month after the termination hearing, she could complete her class within four months of the hearing. And that is within the six-month to a year period the trial court found significant. The State simply relies on Bartman's past history to argue that it would take too long to improve her parental deficiencies.

¶39  Our Supreme Court has noted that past history is a factor that the court may consider in making the determination of future performance. *In re Dependency of J.C.*, 130 Wn.2d 418, 428, 924 P.2d 21 (1996). In *In re J.C.*, the court overturned a Court of Appeals decision holding that the State had to produce evidence of current alcohol use when termination was based on alcohol abuse. *In re J.C.*, 130 Wn.2d at 428. The Supreme Court reasoned that if the substance abuse is so extensive as to render a person unfit

to parent and it is unlikely that that unfitness can be remedied in the near future, it is not relevant whether the abuse occurred in the past or present. *In re J.C.*, 130 Wn.2d at 428.

¶40 But *In re J.C.* does not hold that the State may rely on past substance abuse to prove that there is little likelihood of improvement where the State also concedes that the person has been following her drug abuse treatment for four months. This is not a situation in which Bartman's drug use was so extensive as to make it unlikely that she could not remedy it in the near future. Both of Bartman's drug counselors testified that her prognosis was good. And Bartman presented the testimony of family and friends that she had really changed in the last four months. *In re J.C.* is therefore distinguishable from this case.

¶41 The State's main argument seems to have been that Bartman "told us for . . . close to a year and a half, that she was clean and sober, when in fact she obviously was drink [sic]. She was not honest with us about that information." RP (Apr. 28, 2005) at 42. In other words, the State asked the court to discount Bartman's testimony about her current recovery because she had lied about alcohol abuse in the past.

¶42 But in the light of independent evidence that Bartman was improving, there was not substantial evidence from which a rational trier of fact could have concluded that it was highly probable that there was little likelihood that she would improve within a year's time. While it is possible that Bartman's recovery from her substance abuse problem may be short lived, the State's burden is higher than that. The State has to prove that it is highly probable that Bartman will not improve within six months to a year.

¶43 We acknowledge that the State does not have to give a parent an unlimited time to become a fit parent. As Division One recently noted regarding the parent's improvement in the near future, "theoretical possibilities are not enough." *In re T.R.*, 108 Wn. App. at 166. When it is

eventually possible but not imminent for a parent to be reunited with a child, the child's present need for stability and permanence is more important and can justify termination. *In re T.R.*, 108 Wn. App. at 166.

¶44 But here, unlike in *In re T.R.*, we are not faced with a theoretical possibility. Bartman presented concrete evidence that she was improving. Nor is this an instance in which the trial court evaluated Bartman's credibility and found she was not going to improve. In addition to Bartman's testimony, the State admitted that she was doing well in her recovery, and the trial court found that Bartman would likely improve. The only issue was timing and, thus, the State had to produce some evidence other than Bartman's past performance to indicate that her improvement would not be sufficient within the near future.

¶45 In other words, the State's position was that Bartman's improvement was too little, too late. We, therefore, find it puzzling that the State did not produce any evidence to substantiate that position. We find it very significant that in *In re T.R.*, the State presented the testimony of "[s]everal caseworkers . . . that at least an additional year of services was necessary before reunification" and that the mother in that case would be overwhelmed. *In re T.R.*, 108 Wn. App. at 165-66. There was no such evidence presented in this case; the State only produced evidence that Bartman needed a 12-week anger management course. And without evidence indicating how long it would take Bartman to improve, the State failed to meet its burden to show that it was highly probable that there was little likelihood that conditions would be remedied so that the children could be returned to Bartman in the near future.

¶46 Because substantial evidence does not support the trial court's finding, the State failed to meet its burden to prove the six statutory factors by clear, cogent, and convincing evidence. Therefore, the trial court erred in terminating Bartman's parental rights and we reverse only the termination. This result does not bar the State from filing a new

petition if it should prove that Bartman's progress in early 2005 did not continue. And because we reverse only the termination order, the dependency order is still in effect.[4]

¶47 We note that, for a variety of factors, our accelerated review process was delayed in this case. Appellate review has taken a year and a half since the termination order, and that is simply too long. We are keenly aware of the attendant difficulties our decision may impose on both the children and Bartman, e.g., it may be difficult to explain to the children that Bartman is back in their lives; Bartman may have significant difficulty in reestablishing her role, position, and trust with the children; the stability of the children's lives will be interrupted; and new evidence will have to be generated to support termination. But our task is to ensure that the hearing permanently severing Bartman's parental rights was just. Here, we hold that the State did not carry its burden of proof and, therefore, we are constrained to reverse.

## II. Indian Child Welfare Act

¶48 Bartman next challenges the trial court's finding that the ICWA was inapplicable. She argues that her children are Native Americans and fall under tribal or federal jurisdiction. This argument has no merit, and we address it because it is likely to be raised in a new trial.

■■■ ¶49 The ICWA grants tribes the right to intervene in state court parental rights termination proceedings involving an Indian child. 25 U.S.C. § 1911(c); *In re T.L.G.*, 126 Wn. App. at 187. The act defines an Indian child as:

[A]ny unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.

25 U.S.C. § 1903(4). The ICWA requires notice to a child's alleged tribe where the court knows or has reason to know

---

[4] Our resolution that the State did not meet their burden disposes of the issue Bartman raised regarding early integration.

that an Indian child is involved in a termination proceeding. 25 U.S.C. § 1912(a). Similarly, Washington requires its courts to provide notice to the child's alleged Indian tribe. RCW 13.34.070(10)(a).

¶50 Here, on the strength of Bartman's claim that her children were either Cherokee or Sioux, the State notified all federally recognized Cherokee or Sioux tribes by certified mail. All of the tribes that replied indicated that the mother and children were not members. For the tribes that did not respond to the notice, the State sent a second notice. In fact, the State only stopped trying to contact the tribes after the LICWAC determined that the children were not Indian.

¶51 Here, the State complied with the notice provisions of the ICWA and substantial evidence supported the trial court's finding that the children were not Native American and that the ICWA did not apply.

¶52 Bartman relies on language in *In re T.L.G.* to the effect that "tribal enrollment is not the only means of establishing Indian heritage." *In re T.L.G.*, 126 Wn. App. at 191. But Bartman drastically overstates the importance of this language. The *T.L.G.* court was explaining why notice was a key component of the ICWA and indicated that the tribes ultimately control the rules of their membership. *In re T.L.G.*, 126 Wn. App. at 191. Because the tribes ultimately define their membership, it is possible that a tribe could eschew membership rolls as dispositive. Accordingly, the trial court determined that without notice, the tribes could not properly intervene and, therefore, the State could not simply rely on an admission that the parent was not an enrolled member of a tribe. *In re T.L.G.*, 126 Wn. App. at 190-91. And in *In re T.L.G.*, "neither DSHS nor the court provided notice to the tribe or the BIA [Bureau of Indian Affairs]." *In re T.L.G.*, 126 Wn. App. at 190 (footnote omitted).

¶53 But here, the State did provide adequate notice. Accordingly, *In re T.L.G.* is inapplicable. And all of the tribes that responded indicated that the children were not

members of their tribes. Thus, substantial evidence supports the trial court's finding that the children were not Indian, and the ICWA is inapplicable.

¶54 In conclusion, we reverse and order vacation of the orders terminating Bartman's parental rights but note that the dependency petition remains in effect and DSHS may file another petition to terminate.

¶55 Reversed.

ARMSTRONG and HUNT, JJ., concur.

Reconsideration denied October 11, 2006.