# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of T.F.; L.F.; N.F.; and A.F., | No. 77714-9-I (Consolidated with Nos. 77715-7-I, 77716-5-I, and 77717-3-I) |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | |
| Respondent, | DIVISION ONE |
| v. | |
| T.H., | UNPUBLISHED OPINION |
| Appellant. | FILED: January 28, 2019 |

ANDRUS, J. — T.H. appeals orders terminating her parental rights to four children. She contends substantial evidence does not support the trial court's finding that there is little likelihood she would remedy her parental deficiencies in the near future. She also contends Washington's termination statutes are unconstitutional, facially and as applied to this case. We disagree and affirm the termination orders.

## FACTS

T.H. is the mother of four children, ranging from 14 to 5 years of age: T.F., L.F., N.F., and A.F.[1] As a result of unsafe living conditions, law enforcement

---

[1] The parental rights of the children's father are not at issue in this appeal. Despite having notice and legal representation, the father did not appear at the termination hearing. The trial court terminated his parental rights as to each child on August 23, 2017, pursuant to CR 43(f)(3).

removed the children from T.H.'s custody on September 25, 2015, and filed a dependency action on September 29, 2015.[2] On December 1, 2015, T.H. agreed with the Department of Social and Health Services[3] (Department) to the entry of orders of dependency and admitted that "she must address substance abuse and mental health issues in order to safely parent her children."[4] Exhibit (Ex.) 11 at 3.

In March 2017, the Department filed petitions to terminate T.H.'s rights as to each child, alleging in relevant part, that there was little likelihood that conditions would be remedied so that the children can be returned to T.H. in the near future because she "has not demonstrated the ability to care for her" children and "does not understand and is incapable of providing for the child's emotional, physical, mental, and developmental needs." Clerk's Papers (CP) at 136-40.

Because T.H. does not challenge many of the facts established in the record below,[5] we focus on the facts relating to whether T.H.'s parenting deficiencies improved from the initiation of the dependency to the termination

_____

[2] In September 2015, the duplex in which the children were living had no running water or consistent electricity. The property was littered with piles of trash and drug paraphernalia. The yard contained human feces as the family apparently used it as a bathroom. The children came to school without lunch and wearing the same clothing. The children seemed to be malnourished and there was scarce food in the home. Moreover, law enforcement regularly raided the upstairs neighbor's apartment. T.H. was aware that this neighbor engaged in criminal activity and considered him dangerous. Although law enforcement had previously provided T.H. with alternative housing resources, she did not follow through to move her children to a safer location. The duplex in which the family resided burned down shortly after the children were removed.

[3] As of July 1, 2018, the "Department of Children, Youth, and Families" has assumed the functions and duties of the Department of Social and Health Services. See RCW 43.216.906.

[4] The allegations as to each child are identical, except for where the child's identifying information appears and the notation that counsel had been appointed for T.F. only.

[5] See In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001) (unchallenged findings are verities on appeal).

hearing, and whether T.H.'s deficiencies were capable of being remedied in the near future to support returning the children to her care.

The evidence at trial established that T.H. has a lengthy history of methamphetamine and substance abuse. After T.H. agreed to orders of dependency, the trial court ordered her to complete several services to help her overcome the parental deficiencies caused by her drug abuse, including participation in Project SafeCare;[6] a drug and alcohol assessment; a mental health assessment, and random urinalysis testing (UAs). The trial court granted T.H. supervised visitation with the children and permitted her to visit them twice a week. The court order also required T.H., among other things, to keep the Department informed of her address and phone number and to notify the Department of any obstacles to accessing court-ordered services.

T.H. testified that she did not feel a sense of urgency about complying with the court-ordered services during much of the dependency. The record bears this out. Although the Department provided T.H. with numerous referrals for a drug and alcohol assessment between December 2015 and August 2017, she never followed through in obtaining that evaluation. She never completed any random UAs. She acknowledged relapsing during the dependency and using drugs until June or July 2017. T.H. testified that she had scheduled a drug and alcohol evaluation for the first time for a date in September 2017.

Similarly, T.H. was otherwise absent from all of the dependency proceedings. She failed to appear at the disposition hearing on December 22, 2015, at the dependency review hearings in February 2016 and January 2017, or

---

[6] Project SafeCare is a resource that helps families meet safe housing standards.

- 3 -

at the permanency planning meetings in July 2016 and June 2017. Critically, at each of these proceedings the trial court determined that T.H. was neither in compliance with the dependency orders nor making progress toward correcting the problems that necessitated the children's placement in out-of-home care.[7]

T.H. testified that through 2016 and the spring of 2017, she experienced significant emotional problems, including restlessness, anxiety, and an inability to focus, shortness of breath, an increased heart rate, dizziness, and vision impairment. She "was pretty shut down" and slept for hours. She found having four children to be "overwhelming." She testified she obtained a mental health assessment in April 2017, but she provided the Department with no documentation to verify her participation in this assessment. T.H. acknowledged the assessment recommended that she engage in individual counseling, but she attended only one session with a counselor and did not to follow through with any additional counseling sessions. At the time of the termination hearing, she admitted she had not been back to see a counselor.

T.H. acknowledged that securing adequate housing for her children was one of the primary concerns at the outset of the dependency. During the dependency, housing continued to be a struggle for T.H. As of February 2016, she reported to the Department she was living in a friend's basement, unsuitable housing for the children. T.H. testified that, in July 2017, she started living in a family friend's home. But she acknowledged that this house – in which at least four adults resided – was not a suitable location for her four children to live due to

---

[7] Though T.H. failed to attend any of these hearings, her trial counsel appeared at the proceedings and signed, as to form only, all of the resulting orders.

"a spatial challenge." When asked how long she thought it would be until she had housing in which her children could reside, answered: "I currently am digging into the resource list that I have" but she was unable to provide a concrete timeframe.

T.H.'s supervised visits with her children declined over the course of the dependency and reached a point at which she rarely visited them at all. Initially, when the children were placed with their maternal grandmother, T.H. visited them regularly. That changed in September 2016 when, due to the grandmother's declining health, the children had to be placed with other suitable caregivers.[8] T.H. never again visited N.F. after September 2016. She visited L.F. and A.F. only once. Although she visited T.F. six or seven times in-person and communicated with T.F. several times through Facebook. T.H. did not respond to the Department's invitation to supervise a visit with her children in late August 2017.

The Department's social worker testified that before she could recommend reunification, T.H. would need to obtain and follow the recommendations from a drug and alcohol evaluation and mental health assessment, visit the children more consistently, and work towards obtaining appropriate housing for the family.[9] Because T.H. had made no progress in following the court-ordered

---

[8] T.F., the oldest child, was placed with a family friend she knew and with whom she was comfortable. N.F. and A.F. were placed with a foster caregiver. While originally placed with siblings N.F. and A.F., L.F. was subsequently placed with a separate foster caregiver who was better able to address L.F.'s behavioral and medical needs.

[9] Although T.H. had initially been ordered to complete Project SafeCare, she was never eligible for that service because it is designed for parents that have physical custody of their children. In subsequent dependency orders, the requirement to participate in Project SafeCare was conditioned upon the mother's eligibility for the program.

services or in maintaining consistent contact with the children, the social worker believed termination was in the children's best interest.

The parties agreed the report of the volunteer guardian ad litem (VGAL) could be admitted into evidence in lieu of live testimony. According to the VGAL's report, T.F. wished to remain with the current placement; L.F. expressed little connection to T.H.; N.F. wished to remain with the current placement indefinitely and expressed little connection to T.H.; and A.F. was too young to express any desired wishes. All of the children were doing well in their placements at the time of the termination hearing. Ultimately, the VGAL recommended termination of T.H.'s rights to allow the children to become legally free. T.F., through appointed legal counsel, asked the trial court to terminate T.H.'s parental rights.

All of the children, except for L.F., were in potentially permanent placements. L.F.'s placement was willing to provide long-term care but was not willing to adopt L.F. as of August 2017.

In the three-day termination hearing of August 2017, the trial court considered the testimony of T.H., a Department social worker, the VGAL's report, and admitted 41 exhibits into evidence. In October 2017, the trial court entered findings of fact, conclusions of law, and orders terminating T.H.'s parental rights as to all four children. In key part, the trial court's orders determined:

> This is the tail end of a very old story dating back to the mother at the age of 12. I know there are a lot of issues in terminating, I do not consider that you failed. That is not the message I would ever want to give a parent. I do not want you to feel I have condemned you. That being said.

A dependency petition was filed on September 29, 2015 pursuant to RCW 13.34.030(6)(b) and (c) . . .

(a) The child was found to be dependent pursuant to RCW 13.34.030(6)(c) by order filed on December 1, 2015 as to the mother . . .

(b) The Court entered dispositional orders pursuant to RCW 13.34.130 on . . . December 23, 2015 as to the mother.

(c) The child has been removed from the custody of the parent at the time of this hearing for a period of at least six months pursuant to a finding of dependency.

The Court finds that the first three elements were proven by clear, cogent and convincing evidence.

At the beginning of the case the issues of drug/alcohol, mental health that was not well understood, and parenting were to be addressed.

The Department did make referrals for all services and the services were offered at all times to the mother.

The mother completed a mental health assessment but did not follow up with recommended treatment and/or services.

Seven referrals were made for drug/alcohol treatment. Mother did not complete a drug/alcohol assessment or treatment, and did not participate in random UA's. The mother had relapses and additional use and help was needed. At trial the mother testified she relapsed on methamphetamine in the summer of 2017.[10] The mother did not participate in parenting services. A parenting assessment was never ordered and the mother never requested one. This service is normally offered when a child is closer to return home and this case never got to that point. The Court finds a parenting assessment was not a necessary service. The [C]ourt notes mother did not appear at a single dependency review hearing after her dependency order entered on December 1, 2015.

(d) Services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary

---

[10] T.H. argues that the trial court erred in finding: "At trial the mother testified she relapsed on methamphetamine in the summer of 2017." App. Br. at 1, 20. The record shows that T.H. testified to relapsing on methamphetamines between October 2016 and summer 2017. The reference to relapsing "in the summer of 2017" appears to be a harmless scrivener's error.

services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided. The Court finds that this element was proven by clear, cogent and convincing evidence.

* * *

(f) Continuation of the parent-child relationship clearly diminishes the child's prospect for early integration into a stable and permanent home. The Court finds that this element was proven by clear, cogent and convincing evidence, even for [L.F.].

The court finds it is in the best interest of the child that all of the parental rights of [T.H.] be terminated under RCW 13.34.180 and 190. This was not a close case and the Court is convinced by a preponderance of the evidence and likely even more.

CP at 40-41.

She now appeals as to each child.[11]

## ANALYSIS

### A.    Standard of Review

Parental rights are a fundamental liberty interest protected by the United States Constitution. See Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982). However, "the State has an equally compelling interest in protecting the physical, mental, and emotional health of the children." In re Dependency of H.W., 70 Wn. App. 552, 555, 854 P.2d 1100 (1993) (citing In re Sego, 82 Wn.2d 736, 738, 513 P.2d 831 (1973)). In order to terminate the parent-child relationship, the Department must first prove the following six statutory elements by clear, cogent, and convincing evidence[12]:

(a) That the child has been found to be a dependent child;

---

[11] T.H. objected to multiple findings of fact and a conclusion of law immediately prior to the trial court's entry of the termination orders. She now challenges only one finding on appeal. Unchallenged findings are accepted as true on appeal.

[12] "Clear, cogent, and convincing" means highly probable. In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . and

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). Next, due process requires the trial court to expressly or impliedly find by clear, cogent, and convincing evidence that the parent is currently unfit. In re Welfare of A.B., 168 Wn.2d 908, 918-19, 232 P.3d 1104 (2010). If all of these elements are proven, the trial court must also find by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1).

On review, we ask only whether the court's findings of fact are supported by "substantial evidence"[13] and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). Our Supreme Court has instructed that "[i]f there is substantial evidence

---

[13] "Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." Bering v. SHARE, 106 Wn.2d 212, 220, 721 P.2d 918 (1986) (citing In re Snyder, 85 Wn.2d 182, 185-86, 532 P.2d 278 (1975)).

which the lower court could reasonably have found to be clear, cogent and convincing, an appellate court should not disturb the trial court's findings." In re Aschauer's Welfare, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

B.    Likelihood Parental Deficiencies will be Remedied

T.H. first contends that the Department failed to prove by clear, cogent and convincing evidence that there was little likelihood that her parental deficiencies could be remedied in the near future. Consequently, she claims, the trial court erred when it entered the following finding in the termination orders:

> (e) There is little likelihood that conditions will be remedied so that the child can be returned to a parent in the near future. The Court finds that this element was proven by clear, cogent and convincing evidence. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. In this case, there is a presumption that the mother did not overcome the conditions that led to the removal of her children. However, even without the presumption there is no evidence that the child could be retuned in the near future.
>
> The Court finds that the mother is unfit to parent and that this element was proven by clear, cogent and convincing evidence.

The focus of the RCW 13.34.180(1)(e) is "whether parental deficiencies have been corrected." In re Dependency of K.R., 128 Wn.2d 129, 144, 904 P.2d 1132 (1995). If the Department proves that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future were offered or provided, and the parental deficiencies are not substantially improved within 12 months of the dependency order, a rebuttable presumption arises that this factor is established. RCW 13.34.180(1)(e).

T.H. argues that she made significant progress in the weeks before the termination hearing. She highlights that she found stable housing for herself, obtained a part-time job, stopped her drug use in the summer of 2017, and secured an appointment for a drug and alcohol assessment (scheduled for a few weeks after the termination hearing). She contends that these improvements are similar to those of the parent in In re Welfare of C.B., 134 Wn. App. 942, 143 P.3d 846 (2006), and rebuts the presumption that she could not correct parental deficiencies in the foreseeable future.

A review of C.B., however, shows that these two cases are not alike. In C.B., during much of the dependency, the mother "was an unfit parent who did not take advantage of the services that the State offered her[,]" but about six months before the termination hearing "she did begin taking advantage of the State-offered services and was progressing." C.B., 134 Wn. App. at 953-54. In that case, the Department even conceded that the mother appeared to be "doing what she is supposed to be doing, she has engaged in treatment . . . it appears that she is maintaining in her aftercare program and that she is doing meetings." C.B., 134 Wn. App. at 956. The mother "completed the recommended parenting classes[,]" and "completed her inpatient drug treatment," and there was no indication in the record that her "current residence was unsafe[.]" C.B., 134 Wn. App. at 957. The mother presented concrete evidence that she was improving over a period of months before the termination hearing and the trial court recognized her improvements. C.B., 134 Wn. App. at 953.

The court held that "where a parent produces evidence that she has been improving over a four-month period after the State files a termination petition but before the termination hearing, the State may not rely solely on past performance to prove" there is little likelihood a parent will be reunited with her child in the near future. C.B., 134 Wn. App. at 953. Because the State failed to meet its burden of proof, the court reversed the trial court's termination order. C.B., 134 Wn. App. at 959.

But here, unlike in C.B., there is no evidence that T.H. had steadily improved over a period of months. And the Department was not relying solely on past parental unfitness. It presented evidence of T.H.'s ongoing failure to take steps to fulfill her parental obligations. T.H. was required to obtain a drug and alcohol evaluation, which she had not done; participate in mental health counseling, which she had not done; and complete random UAs, which she had not done. She did not attend a single dependency hearing after the entry of the orders of dependency. As the State argued, she essentially "sat out" the dependency.

There was simply no evidence she was progressing toward the assumption of her parental obligations. Recognized parental obligations include expressing love and affection to one's children; expressing personal concern over their health, education and welfare; supplying the necessary food, clothing and medical care; providing an adequate domicile; and furnishing social or religious guidance. In re Adoption of Lybbert, 75 Wn.2d 671, 674, 453 P.2d 650 (1969). At the time of the termination hearing, T.H. was taking no steps to fulfill

any of these obligations. Despite being provided multiple referrals, T.H. never secured adequate housing sufficient for even one, much less all four, of her children to reside if they were returned to her care. She had little to no contact with the children for an extended period of time, including the weeks immediately preceding the termination hearing. In short, based on the evidence presented at the termination hearing, T.H. had done nothing to remedy her parental deficiencies. Substantial evidence supports the trial court's finding of there being little likelihood that the children could be returned to T.H. in the near future.

C.    Facial Constitutional Challenge

Next, T.H. contends Washington's termination statutes are facially unconstitutional.[14] Specifically, she argues that RCW 13.34.180 and .190 violate substantive due process and interfere with the fundamental rights of parents to the care and custody of their children because the statutes are not narrowly tailored to achieve permanency placement for children.

Although not yet published when the parties prepared their briefs in this case, we subsequently rejected this exact facial challenge to the constitutionality of the termination statues in In re Dependency of M.-A.F.-S., 4 Wn. App.2d 425, 421 P.3d 482, review denied, 191 Wn.2d 1024, 428 P.3d 1191 (2018).

In M.-A.F.-S., a trial court terminated the mother's parental rights to her two children following a lengthy dependency in which the mother failed to substantially address her drug addiction. M.-A.F.-S., 4 Wn. App.2d at 440-44.

---

[14] The result of holding a statute unconstitutional on its face is to render the statute "utterly inoperative" and, therefore, Washington courts must reject facial challenges "unless there exists *no set of circumstances* in which the statute can constitutionally be applied." Tunstall v. Bergeson, 141 Wn.2d 201, 221, 5 P.3d 691 (2000) (emphasis in original) (quoting In re Detention of Turay, 139 Wn.2d 379, 417 n. 27, 986 P.2d 790 (1999)

She claimed that the termination statutes are unconstitutional on their face and as applied. M.-A.F.-S., 4 Wn. App.2d at 444. In rejecting the facial challenge, we held that "the absence of an immediate permanent placement does not undermine the compelling interest of the State to prevent harm to the child from continuation of the parental relationship." M.-A.F.-S., 4 Wn. App.2d at 452.

T.H. has not advanced any arguments that would compel us to depart from our holding in M.-A.F.-S. Consequently, T.H.'s facial constitutional challenge to RCW 13.34.180 and .190 fails.

D.    Constitutionality of Termination Statutes as Applied

Lastly, T.H. contends the termination statutes are unconstitutional as applied to her case and as to L.F. in particular. Washington courts presume statutes are constitutional. In re Dependency of C.B., 79 Wn. App. 686, 689, 904 P.2d 1171 (1995). The party challenging a statute's constitutionality has the burden of proving otherwise. C.B., 79 Wn. App. at 689. A party challenging the constitutionality of a statute as applied must show "that application of the statute in the specific context of the party's actions or intended actions is unconstitutional."[15] City of Redmond v. Moore, 151 Wn.2d 664, 668-69, 91 P.3d 875 (2004).

T.H.'s as-applied challenge rests on the argument that L.F.'s prospects for adoption into a stable, permanent home were "entirely speculative." App. Br. at 38. She argues that although L.F. was in a potentially long-term foster placement at the time of the termination hearing, L.F. did not have prospects for

---

[15] The result of determining a statute unconstitutional as applied forbids future application of the statute under similar circumstances, but such a determination does not totally invalidate the statute. Moore, 151 Wn.2d at 669.

an imminent adoption or permanent placement. Therefore, according to T.H., "no legitimate—let alone compelling—[S]tate interest [is served] in permanently severing all ties" between L.F. and her. App. Br. at 38-40.

But T.H.'s claim overlooks that the State also has an interest in protecting children from harmful parental relationships irrespective of permanency placement. See In re Esgate, 99 Wn.2d 210, 214, 660 P.2d 758 (1983) ("[T]he State established that continuation of the parent/child relationship often created feelings of insecurity and instability in the child. Under such circumstances, termination was proper regardless of the child's adoptability."); In re Dependency of K.D.S., 176 Wn.2d 644, 658, 294 P.3d 695 (2013) ("The State does not have to prove that a stable and permanent home is available at the time of termination.") (quoting In re Dependency of K.S.C., 137 Wn.2d 918, 927, 976 P.2d 113 (1999)).

L.F., born in 2006, was initially placed with siblings with T.H.'s mother. When T.H.'s mother became too ill to care for the children, the Department placed the siblings in a foster home. It subsequently removed L.F. from that placement because L.F. began to exhibit behavioral issues the foster parents were unable to control, including bed-wetting, aggression, and self-harm. The VGAL noted that L.F. had experienced significant trauma before being removed from T.H.'s home and struggled to cope with that trauma. The VGAL believes L.F. needs consistent professional care because of her "fragile state." Ex. 59 at 5. T.H., however, had not visited L.F. since February or March 2017. She

- 15 -

acknowledged it was emotionally abusive on her part not to have visited L.F. for months.

By the time of the termination trial, L.F. was regularly attending counseling sessions and was dealing with bed-wetting and her past self-harming behaviors. L.F.'s demeanor had "calmed down dramatically" in the few months before the hearing, which the VGAL attributed to the regularity of the treatment she was receiving. Ex. 59 at 5-6. L.F. was in a stable, long-term placement. She was able to complete her homework, become an avid reader and develop close friendships at school with no behavioral issues.

According to the unchallenged findings of fact:

> Continuation of the parent-child relationship clearly diminishes the child's prospect for early integration into a stable and permanent home. The Court finds that this element was proven by clear, cogent and convincing evidence, even for [L.F.].

CP 41. While the Department may not yet have a permanent adoptive home for L.F., it has a clear interest in ensuring her health and welfare by providing a stable home environment and attending to her medical and educational needs. There is nothing in the record to support the contention that T.H. was in any position to provide the stability and care L.F. needs, and continuing the relationship would only harm, rather than help L.F. achieve permanency. Under these facts, the lack of an adoptive home for L.F. does not render the termination statute unconstitutional.

In conclusion, substantial evidence supports the trial court's findings as to all six RCW 13.34.180(1) factors. Washington's termination statutes are

constitutional, both facially and as applied to this case. We affirm the trial court's termination orders.

Andrus, J.

WE CONCUR:

Mann, ACJ