# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 74424-1-I |
| | ) | (consolidated with No. 74425-9-I |
| N.C.U., | ) | and No. 74426-7-I) |
| D.O.B.: 04/22/2009, | ) | |
| K.H.U., | ) | DIVISION ONE |
| D.O.B.: 08/29/2006, | ) | |
| D.M.R., | ) | UNPUBLISHED OPINION |
| D.O.B.: 11/13/2004, | ) | |
| | ) | |
| Minor children. | ) | |
| | ) | |
| AMANDA RULE, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF SOCIAL AND | ) | |
| HEALTH SERVICES, | ) | |
| | ) | FILED: November 21, 2016 |
| Respondent. | ) | |

TRICKEY, J. – Amanda Rule appeals the trial court's order terminating her parental rights to her three children. Rule contends that the State failed to prove, as required by RCW 13.34.180(1), that (1) there was little likelihood that her parental deficiencies could be remedied so that the children could be returned to her in the near future; (2) all necessary and available services capable of correcting her parental deficiencies were provided to her; and (3) continuation of the parent-child relationship would clearly diminish the children's prospects for a stable and permanent home. She also asserts that the State's failure to provide notice of an alleged parental deficiency violates due process. We conclude that the State satisfied all necessary elements of RCW 13.34.180

and that Rule fails to demonstrate a due process violation. We affirm the order of termination.

## FACTS

Rule is the mother of son N.C.U., born April 22, 2009, son K.H.U., born August 29, 2006, and daughter D.M.R., born November 13, 2004.[1] Rule was introduced to methamphetamine at age 11 by her father. She began using methamphetamine on a daily basis at age 17 and has been addicted to methamphetamine for the past 24 years. According to Rule, the longest period of time she has ever remained sober is eight months, during each of her pregnancies.

On April 26, 2012, law enforcement officers placed N.C.U., K.H.U., and D.M.R. in protective custody following allegations that Rule was selling methamphetamine from her home. The children were not permitted to take any of their belongings with them due to methamphetamine contamination because the officers discovered methamphetamine mixed in with the children's clothing in their dresser drawers. On June 15, 2012, Rule agreed to the establishment of dependency and to engage in a substance abuse evaluation, random urinalysis (UA) testing twice per week, and a parenting assessment.

On June 18, 2012, Rule underwent a substance abuse evaluation at New Traditions. However, Rule failed to disclose any past methamphetamine use. She also denied that the methamphetamine found by the officers removing her children belonged to her, claiming it belonged to other family members. As a result, the evaluation

---

[1] Rule also has two older children: an adult daughter and a son who lives with his father. They are not at issue in this appeal.

2

recommended only that Rule participate in a relapse prevention group instead of more intensive treatment.

In August and September 2012, licensed psychologist Dr. Carmela Washington-Harvey performed a parenting assessment of Rule. During her interview, Rule denied ever using any drugs other than marijuana, and stated that she did not feel she had any potential for substance abuse. Dr. Washington-Harvey recommended that Rule participate in cognitive behavioral therapy (CBT), individual mental health counseling, family therapy, and parenting classes.

Rule participated in a relapse prevention group at Evergreen Manor between September and December 2012, when she stopped attending. During that period, Rule lived at Hope Place, a housing program run by the Union Gospel Mission. However, she was asked to leave Hope Place in December 2012 for violating the rules of the facility, including using methamphetamine.

On December 11, 2012, Rule underwent a new substance abuse evaluation, which recommended intensive inpatient substance abuse treatment. In March and April 2013, Rule completed a 30-day inpatient treatment program at Thunderbird Treatment Center, followed by an outpatient treatment program. However, Rule described the program as "a joke" and "you could get away with anything there" because "there was no accountability, they didn't UA you [there]."[2]

In 2014, Rule relapsed on methamphetamine again. She submitted UA samples to the Department that were positive for methamphetamine on May 9, May 30, June 6, and June 13, 2014. Though Rule was permitted to visit the children twice a week, and

---

[2] 4 Report of Proceeding (RP) at 473.

was allowed to visit N.C.U.'s daycare even more frequently, her participation in visits was inconsistent.

In September 2014, all three children were placed with Rule's sister in Virginia. Rule was allowed to have weekly telephone and/or Skype calls with the children. This schedule initially worked well but Rule ultimately stopped calling or otherwise attempting to contact the children. The Department filed a termination petition on November 20, 2014.

In December 2014, Rule went to Seattle Mental Health for a mental health evaluation. The evaluation recommended CBT and an evaluation by a staff psychiatrist. Rule participated in only a few therapy sessions and then discontinued treatment. Her therapist tried repeatedly to contact Rule but was unsuccessful.

On January 30, March 31, April 13, and April 22, 2015, Rule submitted UA samples to the Department that were positive for methamphetamine. When confronted with the positive results, Rule adamantly denied using methamphetamine and claimed that the laboratory had made a mistake.

In April and May 2015, Rule sought to enter a "dual diagnosis" program designed to address both substance abuse and mental illness at Valley Cities.[3] During her substance abuse evaluation on April 22, 2015, Rule did not disclose that she was currently using methamphetamine or that she had tested positive for methamphetamine that day. During her mental health assessment on May 7, 2015, Rule again was not forthcoming about her substance use, claiming that she had been sober for three months when she had actually used methamphetamine the prior week. Rule routinely

---

[3] 3 RP at 375.

failed to show up for substance abuse treatment meetings. Rule also failed to show up for the Department's scheduled UA appointments on May 4, May 13, May 21, May 27, May 30, and June 15, 2015. On June 2, 2015, Rule "just dropped out" of the Valley Cities dual diagnosis program and "didn't come back."[4]

In June 2015, Rule's sister informed the Department that she could no longer care for all three children. The children were returned to Washington and placed together in foster care. When Department social worker Vilma Estrada asked the children about visiting Rule, both D.M.R. and K.H.U. said that they did not want to. D.M.R. said, "I don't trust her anymore," and K.H.U. expressed fear about the visits.[5]

On July 22, 2015, Rule again entered Thunderbird's 30-day inpatient substance abuse treatment program. The same day, she submitted a UA sample that was positive for methamphetamine. On July 28, 2015, Rule was placed on a "[l]ast [c]hance" contract for twice being discovered smoking cigarettes in violation of program rules.[6] Rule completed the program on August 20, 2015, and re-entered outpatient substance abuse treatment at Valley Cities on September 15, 2015.

In September 2015, Department social worker Ana Watson attempted to set up an in-person visit between Rule and the children. Though D.M.R. was resistant to the idea, Watson convinced her to attend the visit by reassuring her that she could end the visit if she felt uncomfortable. Rule did not show up for the visit. Watson attempted to set up another visit, but this time all three children refused to go. Instead, all three children expressed a desire to be adopted by their current foster parents.

---

[4] 3 RP at 391.
[5] 2 RP at 236.
[6] Exhibit 91.

Trial on the termination petition began on October 14, 2015. At the time of trial, D.M.R. was 10 years old, K.H.U. was 9 years old, and N.C.U. was 6 years old. They had been out of Rule's custody for approximately three and a half years. The trial court heard testimony from 11 witnesses and reviewed 60 exhibits. On November 4, 2015, the trial court entered findings of fact and conclusions of law and an order terminating Rule's parental rights. Rule appeals.[7]

## ANALYSIS

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; [and]

. . . .

---

[7] The parental rights of K.H.U.'s and D.M.R.'s fathers were terminated in February 2015 and they are not parties to this appeal. The father of N.C.U. is deceased.

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). Second, if the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1).

Findings of fact must be supported by substantial evidence. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003). Unchallenged findings of fact are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). In determining whether substantial evidence supports the trial court's findings, we will not weigh the evidence or the credibility of witnesses. E.L.F., 117 Wn. App. at 245.

### Little Likelihood of Reunification

Rule first argues that the Department failed to prove there was little likelihood that her parental deficiencies could be remedied so that the children could be returned to her in the near future, as required by RCW 13.34.180(1)(e). The trial court's findings to the contrary are supported by substantial evidence.

The focus of RCW 13.34.180(1)(e) is whether a parent's identified deficiencies have been corrected. In re Welfare of M.R.H., 145 Wn. App. 10, 27, 188 P.3d 510 (2008). "Even where there is evidence that the parent may eventually be capable of correcting parental deficiencies, termination is still appropriate where deficiencies will not be corrected within the foreseeable future." In re Welfare of A.G., 155 Wn. App. 578, 590, 229 P.3d 935 (2010). Although the law provides no numerical standard to measure the foreseeable future, this determination is a factual inquiry evaluated from

"the child's point of view," which varies with the child's age. In re Dependency of A.C., 123 Wn. App. 244, 249, 98 P.3d 89 (2004).

The evidence was undisputed that Rule had a lengthy history of methamphetamine addiction. Rule does not challenge the following findings of fact:

> 2.12 The mother has been addicted to methamphetamines throughout her entire adult life. . . .
>
> 2.13 By the mother's own admission the longest period of time that she has ever remained sober or abstinent from methamphetamine is approximately eight months during the pregnancy of her children. This claim was not corroborated.
>
> 2.14 Again through the mother's admission she has relapsed on multiple occasions throughout this dependency.[8]

Rule participated in a variety of substance abuse treatment programs during the three and a half years the children were dependent. However, the evidence showed that Rule frequently discontinued treatment early, violated program rules, and was untruthful about the extent of her substance abuse history. At the time of trial, Rule had been sober for only approximately 90 days.

Moreover, Rule had other parental deficiencies that she was not addressing, particularly in regards to her mental health. The following findings of fact are also unchallenged by Rule:

> 2.20 The mother was referred for a mental health evaluation, which she finally completed at Sound Mental Health in December 2014. The mother never returned to Sound Mental Health following the evaluation, which recommended treatment. In June 2015, she was discharged from their program due to a lack of contact.
>
> 2.21 The mother's next attempt at receiving mental health counseling took place on October 19, 2015, in the midst of the termination trial. Valley

---

[8] Clerk's Papers (CP) at 311.

Cities, which provided the intake, recommended that the mother engage in Dialectical Behavioral Therapy, which is a minimum six month treatment regiment [sic].

. . . .

2.44 The mother has been diagnosed with mental health and psychological issues including depression and anxiety. It is unknown to this court how her mental health plays into her co-occurring drug addiction because she just started mental health treatment on Monday, October 19, 2015, after having three and a half years of opportunity to engage. The extent of her mental health issues is clearly concomitant with her drug addiction. It is a mystery to the court why she resisted mental health services despite them being ordered and clearly provided by the Department.

2.45 The mother's resistance does indicate to the court that the mother has failed to recognize over the last three and a half years that something in her psychological framework has prevented her from remedying both the drug addiction and severe depression through compliance with treatment, services, or assessments.[9]

Dr. Washington-Harvey testified that "[the] minimum would be for [her] a year of sustained change" before Rule could be able to meet the needs of her children.[10] She testified that Rule was only in the beginning stages of sobriety and mental health treatment and had not shown "sustained change" by the time of the termination trial.[11] Dr. Washington-Harvey also testified that Rule would need to demonstrate sobriety for at least six months before she could even start making progress in CBT, a highly structured form of psychotherapy focused on changing an individual's behaviors and responses. Estrada testified that, for a person with as lengthy of a history of drug addiction as Rule, she would want to see at least 18 months of sobriety before considering reunification. And Joseph Bynum, the children's court-appointed special advocate testified that, for N.C.U., the "near future" was "probably tomorrow" and for

---

[9] CP at 311-14.
[10] 3 RP at 347-48.
[11] 3 RP at 348-49.

9

D.M.R. and K.H.U., even a month would be a long time.[12]  Based on this evidence, the trial court appropriately found that the children could not be reunified with Rule in the near future.

Rule argues that because she had made progress in the months leading up to the trial, the court could not rely solely on her past behavior in making the "near future" finding.  She argues that the facts of her case are analogous to In re Welfare of C.B., 134 Wn. App. 942, 143 P.3d 846 (2006).  In C.B., the Department originally removed the children from the mother due to her lengthy history of drug use.  By the time of trial, the mother had nearly completed a substance abuse treatment program and the evidence was undisputed that "she was doing well in her recovery" and her prognosis for sustained sobriety was good.  C.B., 134 Wn. App. at 959.  The court held that, once a parent shows that "she has been improving," the State may not rely "solely on past performance to prove that it is highly probable that there is little likelihood that the parent will be reunited with her children in the near future."  C.B., 134 Wn. App. at 953.

This case is substantially different from C.B.  The trial court's finding that reunification would not occur in the near future was not premised merely on the mother's past failed treatment attempts.  Instead, the trial court noted that the mother was still early in her recovery and had not even begun to address her mental health.  The evidence showed that Rule could not even begin to succeed in CBT until she had been sober for at least six months, and that CBT or a similar behavioral modification program was critical to her sustained sobriety.  The trial court did not err in finding that

---

[12] 3 RP at 428.

10

there was little likelihood that the children could have been returned to Rule in the near future.

Services Offered or Provided

Rule next contends that the Department failed to prove that it offered or provided all necessary services capable of correcting her parental deficiencies as required by RCW 13.34.180(1)(d). Specifically, she argues that the Department should have provided "bonding and attachment" therapy when the children, particularly D.M.R., began refusing to visit her.

The Department has a statutory obligation to provide all services ordered by the court, well as "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). "Necessary services" are those services "needed to address a condition that precludes reunification of the parent and child." In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014).

There is no evidence in the record that bonding and attachment therapy was a necessary service. Rule herself acknowledged that the critical factor in re-establishing a relationship with D.M.R. was committing to her treatment program and showing up for visitation, not additional services. At trial, Rule testified:

> [DEFENSE COUNSEL:] Tell us about seeing the kids when they came back from Virginia.
>
> [RULE:] . . . [D.M.R.], she was kind of – she's angry at me, and I get it. She's super angry at her mom. And, I understand why she's angry. She has every right to be angry at me.
>
> [DEFENSE COUNSEL:] Why do you think she's angry at you?

11

[RULE:] Because I've – it's taken me so long. Uhm, she wanted to come home.

[DEFENSE COUNSEL:] And, do you think you could repair that relationship with her?

[RULE:] Absolutely. I just need a little time. We just need time, one-on-one time with each other. Uhm, there's a lot of, uhm, mending and for, you know, fixing that I have to do. And, those are my – what kid don't need their mom in their life? [13]

Moreover, "[w]here the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services." M.R.H., 145 Wn. App. at 25. The provision of a service is futile where a parent is unwilling or unable to participate in it. In re Welfare of Aschauer, 93 Wn.2d 689, 699 n.6, 611 P.2d 1245 (1980). Here, the Department did attempt to work with the children to address their reluctance to visit Rule. Watson spoke at length with the children, particularly D.M.R., about the importance of visiting their mother. She strongly encouraged them to at least show up for a visit. She told them that she would be there with them the entire time, and gave them the option to end the visit early if they wished. Rule did not even appear for the visit. It is difficult to conclude that Rule would have participated any more consistently in bonding and attachment therapy.

The evidence does not support Rule's claim that bonding and attachment therapy was a necessary service that the Department failed to offer or provide. The trial court properly determined that all necessary services were offered or provided to Rule.[14]

---

[13] 4 RP at 477-78.

[14] Rule's reliance on In re Matter of B.P. v. H.O., 186 Wn.2d 292, 376 P.3d 350 (2016), is misplaced. In B.P., the court reversed an order of termination on the grounds that the Department failed to offer or provide bonding and attachment therapy for the mother and her older child, 5-year-old, B.P. But the facts in that case are distinguishable. There, the mother was successfully addressing her drug addiction, had custody of a younger child, and the State

Lack of Notice

Rule argues that the trial court violated her right to due process by terminating her parental rights based on parental deficiencies about which she did not receive adequate notice. Specifically, Rule contends that she was never informed that her strained relationship with her children could constitute a parental deficiency supporting termination of her parental rights.

A parent's right to the care and custody of their children cannot be abridged without due process of law. In re Interest of Darrow, 32 Wn. App. 803, 806, 649 P.2d 858 (1982). In particular, due process requires that parents facing termination of their parental rights are entitled to "notice of the specific issues to be considered" in order "to prevent surprise, helplessness and disadvantage." In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970).

---

conceded that she was a fit parent to the younger child. The mother was also having regular, consistent visitation with B.P. and the visits were going well; the only question was whether B.P. could psychologically detach from her foster parents and attach to her mother as her primary caregiver. In addition, there was a significant amount of testimony about the importance of bonding and attachment and the availability of such services in the local area.

Instead, this case is more similar to In re Matter of K.M.M., __ Wn.2d __, 379 P.3d 75 (2016). In that case, 14-year-old K.M.M. told her therapist she wanted to be adopted by her foster parents, and began demonstrating reluctance and ultimately outright refusal to visit her father. There, the court held that the provision of bonding and attachment therapy would have been futile because K.M.M. was unwilling to cooperate and the father had not progressed enough in his own mental health treatment for it to be effective:

> Although [the father] was willing to participate in attachment and bonding services, these services would not have been able to remedy K.M.M.'s lack of attachment. K.M.M. could not tolerate interactions with her father and refused to attend visitation. Thus, as a practical matter, K.M.M. would not be a willing participant in any therapeutic services with her father. There was no way for the social workers to force K.M.M. to participate in services, short of lying to her or using physical force, which are both prohibited by department policy. . . .
>
> . . . .
>
> Furthermore, because he had not addressed his underlying mental health issues, [the father] "hasn't become ready to support [K.M.M.]'s attachment to him."

379 P.3d at 86 (third alteration in original).

Here, however, the Department did not allege that a lack of attachment constituted a parental deficiency or a condition precluding reunification. Watson testified that Rule's parental deficiencies were "[h]er being unable to stay sober enough to continue following the court orders" and "the inconsistencies in her visits to continue a relationship with her children."[15] And in closing argument, the assistant attorney general argued that the Department had offered services "in the areas of [Rule's] deficiencies, drug/alcohol and mental health."[16]

Nor did the trial court identify the children's refusal to visit as a parental deficiency.[17] Instead, the trial court clearly and repeatedly identified Rule's parental deficiencies as her failure to treat her lengthy history of substance abuse and her mental health issues.

> 2.52 . . . There has been zero stability for these children, and there is only one reason for this: the mother's failure to address her meth[amphetamine] addiction and mental health issues in a timely fashion.
>
> . . . .
>
> 2.65 The right of these children to basic nurture, physical and mental health and safety includes the right to a safe, stable, and permanent home and a speedy resolution of the dependency proceedings. This dependency has hardly been speedy and that has been due to one factor – mother's failure to address and remedy her lifelong drug addiction and mental health issues. . . .[18]

---

[15] 1 RP at 111.

[16] 4 RP at 513.

[17] Though the trial court noted that D.M.R. strongly expressed a desire not to see her mother, and stated that "[t]he wishes of the children have been taken into consideration by the court, this appears to be part of the trial court's "best interests of the child" analysis as required by RCW 13.34.190(1). CP at 315.

[18] CP at 314, 316.

Because D.M.R.'s unwillingness to visit was not the basis for the termination of Rule's parental rights, there was no due process violation.

### Stable and Permanent Home

Finally, Rule contends that the trial court erred in finding that the continuation of the parent-child relationship diminished the children's prospects for early integration into a stable and permanent home, as required by RCW 13.34.180(1)(f). She argues that at the time of the trial she had a job and a home, and, therefore, possessed a "stable and permanent home" for the children. RCW 13.34.180(1)(f).

RCW 13.34.180(1)(f) "is mainly concerned with the continued effect of the legal relationship between parent and child, as an obstacle to adoption." A.C., 123 Wn. App. at 250 (emphasis omitted). The State can prove this factor by showing that "a permanent home exist[s] but the parent-child relationship prevents the child from obtaining that placement." In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013).

Though Rule had housing at the time of the termination trial, her parental deficiencies prevented reunification with her children anytime in the near future. Thus, Rule's home was not a "stable and permanent home" that offered "prospects for early integration." RCW 13.34.180(1)(f). However, the children had prospects to be adopted by their foster parents. Rule does not challenge the trial court's finding that "permanence in the [foster] home cannot be achieved through indefinite foster care" and the children "cannot be adopted until all parental rights are terminated."[19] Thus, the trial

---

[19] CP at 316.

15

court properly found that Rule's legal relationship with her children interfered with their early integration into a stable and permanent home.

We affirm the trial court's order terminating Rule's parental rights.

_____Trickey, J_____

WE CONCUR:

_____          _____Becker, J._____

16