IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No. 39004-7-III |
| C.W. | ) | (Consol. with No. 39005-5-III |
| A.W. | ) | No. 39006-3-III |
| D.C. | ) | No. 39007-1-III |
| R.C. | ) | No. 39027-6-III |
| M.C. | ) | No. 39028-4-III) |
| | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

STAAB, J. — In this consolidated appeal, TW, the mother, appeals the trial court's termination of her parental rights to four of her children, and JW, the father, appeals the trial court's termination of his parental rights to two of his children. Both parents argue that the Department of Children, Youth and Families failed to establish that all necessary services were expressly and understandably offered and provided. Specifically, the mother argues that the Department failed to take steps to reunify contact with her children so she could complete services. The Father argues that the Department failed to provide adequate treatment for his chemical dependency and adequate treatment from a Christian mental health counselor. Additionally, both parents challenge findings that there is little likelihood that conditions will be remedied so that the children can be returned to the

parents in the near future. We affirm the court's order terminating the parental rights of the mother and father.

## BACKGROUND

1. DEPENDENCY

TW, the mother, and JW, the father, were married and had two children together: CW (born on September 29, 2011) and AW (born on June 12, 2010). The mother has three older children with another man: DC (born on October 29, 2007), RC (born on April 1, 2006), and MC[1] (born June 15, 2004). The father of these three children has relinquished his parental rights and is therefore not a party to this appeal.

In October 2018, the Department filed separate dependency petitions against the mother and father for all of the children. The parents entered agreed orders of dependency.

The dependency case was assigned to social workers from the Department: Tiffany Labish, who worked on the case from March 2019 to December 2021, and Margaretia Taylor, who worked on the case beginning in February 2022.

During the dependency, the three youngest children, CW, AW, and DC, disclosed that they had been the victims of sexual abuse perpetrated by both of the parents, and that

---

[1] As MC turned 18 during the dependency, the mother's parental rights with regard to him are not the subject of the termination.

they had also perpetrated abuse on each other. CW, in particular, made very graphic and explicit disclosures of sexual abuse. Both CW and AW alleged that their mother and father were involved in the abuse. Labish described the children's disclosures as "varied" and "numerous" but also consistent. Rep. of Proc. (RP) at 160-61.

Following the disclosures in April 2019, the trial court entered a temporary no contact order between the parents and the children and then extended the order suspending visitation for an additional 30 days "pending the recommendation by the children's individual counselors that visitation should resume." Ex. P-16. Throughout the dependency, the trial court entered orders extending the suspension of visitation during the dependency based on a determination that visitation would jeopardize the health, safety, or welfare of the children. The Department did not pursue visitation during the dependency as it was not in the children's best interest, and during at least part of the dependency there was an ongoing law enforcement investigation into the allegations.

In March 2020, the Department filed petitions to terminate the parental rights of the mother and both fathers.

Approximately three years after the dependency was filed, the trial court granted the mother's motion for therapeutic visitation with DC, but denied it with respect to the other children. The order permitted the mother to have a single supervised community

visit with DC, who was then 14 years old, and had expressed interest in a visit. The court determined that the nature of a supervised visit would protect his safety. The court found that because DC was a teenager, it should consider his preference in determining visitation. However, the trial court declined the mother's request for visitation with the other children as AW and CW's counselor did not recommend contact with their mother and RC did not want contact with his mother.

Following the initial visit, DC requested further visitation, and visitation continued for about two months. After a couple months, DC requested that the visits be terminated because he believed the mother was not making any progress toward change and that she had showed up to the latest visit under the influence. The social worker, Taylor, admitted that she did not attempt to refer the mother for a parenting assessment or family therapy during the two months she was visiting with DC. She noted that she had spoken with DC about resuming family therapy, and he communicated that he did not want to engage in it. Taylor also said that the mother's ability to complete the evidence-based parenting or "parenting" was dependent on DC's discretion.

2. TERMINATION TRIAL

The case proceeded to a termination trial in May 2022. "Neither parent appeared for trial despite the [trial court] offering them to appear by Zoom or by phone and giving the attorneys opportunities to contact them before [the start of] each day." RP at 636.

No. 39004-7-III (Consol. with Nos. 39005-5-III, 39006-3-III, 39007-1-III, 39027-6-III, 39028-4-III)
*In re C.W.*


A. *Evidence Related to the Mother*

The Department identified the mother's parental deficiencies as "physical abuse, sexual abuse, chronic neglect, chemical dependency, and failure to protect." RP at 44. The agreed services for the mother were to "successfully complete a chemical dependency assessment and any recommended treatment," participate in any "random UA/BA[2] testing . . . as recommended," "successfully complete a parenting assessment," "successfully complete an evidence-based parenting program," "successfully complete mental health treatment and individual counseling," and "follow all recommendations." RP at 45-46.

1) Chemical dependency

The mother did complete a chemical dependency assessment, and the assessment did not find any current chemical dependency issues but also found that the mother could be subjected to a UA upon reasonable suspicion. The mother was subjected to a number of UAs, all came back positive for THC.[3] However, Labish noted that as the mother was removed from the children at the time of the positive test results, "there was no way to assess [the] mother's ability to safely parent while using THC." RP at 59.

---

[2] Urinalysis/breath analysis.
[3] Tetrahydrocannabinol.

5

No. 39004-7-III (Consol. with Nos. 39005-5-III, 39006-3-III,
39007-1-III, 39027-6-III, 39028-4-III)
*In re C.W.*

For the purposes of chemical dependency, no further treatment was recommended for the mother. No additional assessment was requested or ordered during the dependency.

2) Parenting assessment

In regard to the court-ordered parenting assessment, the mother failed to participate although a referral was sent in December 2018. After the court ordered the mother to have no contact with the children, the Department did not refer the mother for a parenting assessment a second time because the assessment requested the provider to be able to observe the parent and child interact, and the trial court continued to suspend visitation between the mother and the children.

3) Evidence-based parenting program

The mother was referred to an evidence-based parenting program but because there was a no contact order between the mother and children, she was able to participate in the part of the program that did not require the children's participation. The mother completed the "Positive Parenting Program" as far as she could with visitation suspended.

After she completed the parent part of the program, the program provider, Lacey Hurley, recommended that the mother receive ongoing mental health therapy. Hurley said she did not think she could make recommendations for follow up for the mother

6

other than continuing in individual counseling because the mother had only completed part of the program. Hurley also noted that it was difficult to make a recommendation or provide feedback because "[the mother] wasn't able to provide a lot of examples of struggles with parenting. She really identified parenting as fairly easy for her . . . she really identified very minimal parenting challenges." RP at 141-42.

Hurley did file a report with the Department raising a concern about the mother's "lack of insight" into how her behavior and parenting practices impacted her children's behavior. RP at 143. Hurley said she believed the mother lacked insight because collateral information outlined a number of behavioral issues with the children but the mother indicated she had minimal behavioral issues with her children.

Although a parenting program can help a parent gain insight, the mother did not gain any additional insight during the course of the parenting program. The mother never fully completed the program, and the Department did not refer her for a second evidence-based program because all of the other programs required parent-child interaction.

4) Mental health treatment

The Department also produced evidence that the mother failed to address her deficiencies through mental health treatment. The mother initially saw a counselor at New Horizons, Rhonda Del Carlo, for three months from the end of 2018 to 2019. The mother was referred to Del Carlo with "unspecified anxiety disorder" and attended eight

7

total appointments. RP at 211. During the counseling sessions, the mother only minimally addressed the CPS[4] allegations and would discuss her concerns of distress "but it was very surface." RP at 215. The mother eventually terminated the relationship due to scheduling concerns. As part of her discharge, Del Carlo provided referrals to other agencies and also wrote out a summary of treatment and progress made. Although the mother made "partial improvement," she "made minimal progress on her goals of learning coping skills to address anxiety." RP at 212, 217.

After she stopped seeing Del Carlo, the mother asked the Department not to refer her for mental health treatment because she preferred a Christian counselor and wanted to engage in counseling on her own. She attended two sessions with Mary Kay Hall, a Christian counselor she had found. But Hall terminated treatment when she learned that the mother was involved in a dependency case. Hall provided minimal information about her engagement with the mother but informed Labish that the mother had been unwilling to participate in any counseling services without the father.

The Department submitted a mental health treatment referral for the mother in June 2020 and then a follow up referral in April 2021. However, the mother never engaged with either of these providers.

---

[4] Child protective services.

In February 2022, after Taylor was assigned to the case, the mother communicated to Taylor that she had been requesting a Christian counselor who was not contracted with the Department. Taylor connected her with a counselor that fit this description, Suzie Toews. Taylor informed Toews that the mother needed to address the concerns that led to the dependency, the mother's history of her own sexual abuse, and the mother's ability to safely parent and protect her children. The mother started seeing Toews in March 2022. The Department did not have any information on the type of therapy and any progress the mother made with Toews because the mother would only allow the fact that she was in treatment and her attendance to be reported.

Toews testified that she had been teaching the mother skills to deal with her anxiety and depression. Although Toews said that the mother was "moving ahead," she also stated that "[i]t starts with denial, and we pretty much still are working on denial." RP at 556, 559-60. Toews also said that she could not really say how long it would take for the mother to process her anxiety and depression because there were so many unknowns. Toews did not identify any safety concerns with the children being placed in the mother's care but also said she did not have enough information to make that determination.

There was no evidence presented that the mother addressed the underlying issues that led to the dependency with any of her counselors.

5)  Psychosexual evaluation

The Department also referred the mother for a psychosexual evaluation in September 2019.  Because the Department could not find a provider in Spokane with availability, it referred the mother to a provider, Jodie Field, in Omak, Washington.  The mother completed the evaluation in January 2020.

During the evaluation, Field asked the mother about the alleged sexual abuse, and the mother denied participation.  However, Field explained that the evaluation did not look at whether the mother had committed a sex offense or sexual deviancy but instead focused on her amenability to treatment.  Field testified that the mother was defensive during the testing and as a result, the information obtained from the evaluation was probably limited and there was "likely more to know about her."  RP at 190.  However, Field also stated that she performed a polygraph examination on the mother and "[n]o deception was indicated."  RP at 192.

Field's report from the psychosexual evaluation stated that the mother needed mental health counseling and specified that she needed trauma counseling to heal from her own childhood trauma.  The report also recommended parenting programs or classes to help the mother identify safe individuals to bring around her children, how to parent safely, and how to set safe boundaries with her children.

10

6) Family therapy

The Department referred the parents to family therapy and both engaged in the

service for two sessions in 2018. The therapy was halted at the request of the therapist

after, along with other disclosures, CW provided graphic and explicit accounts of sexual

abuse that had occurred in their family home. The therapist believed that the children

needed to process the trauma before moving forward for family therapy to be productive.

Because visitation was never resumed between the parents and children, the Department

did not provide another referral for family therapy.

*B.  Evidence Related to the Father*

The father's parental deficiencies were "physical abuse, sexual abuse, chemical

dependency, and chronic neglect." RP at 44-45. The court-ordered services for the

father included participation in UA/BA testing as recommended by treatment providers

or upon reasonable suspicion, "successfully complete a parenting assessment,"

"successfully complete mental health treatment or individual counseling," and

"[d]emonstrate the ability to meet the child's physical and psychological needs, as well as

maintain a clean, safe, nurturing, stable and drug and alcohol free home." RP at 86. The

Department also referred the father for psychosexual evaluation following the children's

sexual abuse allegations.

11

1)  UA/BA testing

There was never any order for the father to engage in UA/BA testing as neither of the social workers ever had a reasonable suspicion of use, and he never participated in such testing.

2)  Parenting assessment

There was a referral for a parenting assessment in 2018, but the father did not participate in the assessment, and a second referral was never entered because visitation between the father and the children was suspended.

3)  Mental health treatment

Regarding mental health treatment, the father "was very clear throughout the dependency that he didn't want to work with any provider that was connected with the department whatsoever." RP at 89.  Like the mother, the father sought treatment from Hall, but Hall had also terminated his treatment after two sessions.  The father then informed the Department he was going to seek a different provider, but the Department never received any additional information on further treatment.  The Department referred the father to Renewed Stories for mental health treatment in June 2020, but the father did not engage with the provider.

Labish said that, based on her understanding, the Department was not permitted to ask counselors their religion prior to contracting with them.  However, she noted that she

did put in her counseling referral that the parents preferred a Christian counselor "so that way hopefully if people responded that they had availability, they would, also, be able at that time to indicate whether or not they were Christian." RP at 164. Labish encouraged the father to seek out counselors in the community and also "tried to seek some community providers out online that did identify as Christian based." RP at 165.

4) Psychosexual evaluation

The Department referred the father for a psychosexual evaluation in November 2019, but he failed to complete the evaluation, although he attended the mother's evaluation. After the initial referral expired, the Department submitted a second referral, but the father still did not participate in the evaluation.

After being assigned to the case, Taylor referred the father to John Colson for mental health treatment as well as a psychosexual evaluation. Colson was trained to evaluate and treat juvenile and adult sex offenders. He had previously treated the father in 2010 for about a year following allegations of sexual abuse in the home.

In regard to this case, the father attended a single appointment with Colson, but refused to complete the evaluation or engage in any services. The father did not have any further contact with Colson after the appointment.

C. *Additional Testimony*

Labish testified that her communication with the parents throughout the case had been poor because both the father and the mother had requested that all communications go through their attorneys.

Labish testified that during the case, there were ongoing conversations with the children's providers about contact with their parents and the providers consistently stated that suspension of parent-child contact should continue until the parents were willing to admit how they had traumatized their children and work through it in a therapeutic setting. As it was never the recommendation to pursue the parent-child relationship, contact was never resumed.

Dr. Jon Christensen, an expert in pediatric psychology, evaluated CW in the fall of 2020 and testified that CW had some sort of cognitive impairment along with potential memory issues.

Although they had multiple placements during the dependency, at the time of trial, AW and CW were placed in an adoptive home. AW and CW both expressed a desire to stay in their current placement.

DC also, despite having multiple placements, had a potential adoptive home though he was not placed there at the time. DC would not refer to JW as his father and would only refer to his mother using her first name.

RC additionally had several placement disruptions and went "on the run" on multiple occasions, but at the time of trial, he was in a stable home. RC did not wish to have further contact with his mother, and he wanted her parental rights to be terminated "so he can move on with his life." RP at 256. A mental health therapist who worked with him testified that RC refused to use the mother and father's first names when discussing them and would instead refer to them as "bio mom" and "stepdad." RP at 296.

3. TRIAL COURT'S DECISION

At the conclusion of trial, the court took the matter under advisement and eight days later reconvened the parties for an oral decision. Like the trial, neither of the parents attended the trial court's oral ruling. The trial court followed up with detailed findings of facts and conclusions of law.

As part of its decision, the trial court found that all necessary services reasonably available and capable of correcting deficiencies within the foreseeable future had been expressly and understandably offered or provided to both parents and that there was little likelihood the conditions would be remedied so that the children could be returned to the parents in the near future.

The trial court found that the mother had been offered numerous counseling options but failed to follow through with any of them. Moreover, the testimony from her

15

counselors indicated that they all believed the mother needed to deal with her own trauma and deficiencies before she could begin working on her parenting.

Specifically, the court found that the mother was referred for a parenting assessment in December 2018, prior to the no contact order being put in place in April 2019, but did not contact the counselor she was referred to. She had completed the portions of the parenting assessment that she could while visitation with the children was suspended, and the counselor who oversaw the program recommended she continue with counseling and testified that the mother lacked insight as a parent as she could not provide examples of where she struggled as a parent and said that it was very easy to parent five children.

The trial court noted that the no contact order preventing the mother from completing the parenting assessment was "based on the trauma caused by mom's failure to protect and lack of supervision." RP at 633. The trial court had indicated that there would be no contact with the children until it was recommended by the children's counselors. At the time, neither AW nor CW's counselors were recommending visitation. RC and DC did not indicate that they wanted contact with the mother. Although DC tried to resume contact with the mother in February 2022, he asked for the visits to be stopped after he believed that the mother was under the influence at one of the visits.

In regard to whether the mother could remedy her deficiencies in the near future,
the trial court found that it was clear that the mother made no progress in the twelve
months following the entry of the disposition order, and thus the rebuttable presumption
of unfitness applied. The mother had expressed in the parenting program that parenting
her five children was easy and that there was little she needed to change. After three
years, the mother had still failed to engage in the recommended areas of treatment, which
were processing her own abuse and neglect as a child and how to keep her own children
safe from any abuse and neglect. Aside from DC, the mother had not seen her children in
three years, and repairing the bond would be unlikely to occur in the near future.

The trial court found that the father's participation in two family therapy visits was
minimal and occurred only at the beginning of the dependency. The trial court also found
that the father had completed two UA/BA tests at the request of the Department and both
had come back clean, so no further follow up was needed based on the results. Despite
being given multiple opportunities, the father did not complete a psychosexual
evaluation. Additionally, the trial court found that the father "never engaged in mental
health treatment or individual counseling during the life of the case" despite multiple
referrals from the Department. Clerk's Papers (CP) at 2522. The father also did not
complete the parenting assessment initially and then was unable to do so after the court
ordered him not to have contact with the children.

No. 39004-7-III (Consol. with Nos. 39005-5-III, 39006-3-III,
39007-1-III, 39027-6-III, 39028-4-III)
*In re C.W.*

The trial court concluded that "the father demonstrated through his own inactions and omissions" an unwillingness or inability to make use of the services provided. CP at 2523. It was clear that even engaging in services at that point would be insufficient to allow the father to remedy his parental deficiencies in what would be the foreseeable future for AW and CW. The court further supported this conclusion with findings that the father had not seen the children in about three years and failed to even appear for the termination trial, making it clear that he had no interest in making changes.

Thus, the trial court found that the State had met its burden to prove by clear, cogent and convincing evidence that the mother was unfit to parent and all services capable of correcting deficiencies had been offered. The trial court also found that it was in the best interests of the children to terminate the parent-child relationships.

Accordingly, the trial court granted the State's motion to terminate the parental rights of both the mother and the father with regard to each of the children.

Both the mother and father appeal.

ANALYSIS

1.    STANDARD OF REVIEW

"Parents have a fundamental right to the care and custody of their children, and a trial court asked to interfere with that right should employ great care." *In re Welfare of M.R.H.*, 145 Wn. App. 10, 23, 188 P.3d 510 (2008). To terminate a parent-child

18

relationship, the State must follow a two-part process. *In re Parentage of I.M.-M.*, 196 Wn. App. 914, 921, 385 P.3d 268 (2016). First, the State must show the parent is unfit. Doing so requires the State to prove the six elements set forth in RCW 13.34.180(1):

> (a) That the child has been found to be a dependent child;

> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .

> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

The State must prove the statutory elements by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i); *I.M.-M.*, 196 Wn. App. at 921.

Second, the State must also show that it is in the best interests of the child to terminate the parent-child relationship. RCW 13.34.190(1)(b).

19

No. 39004-7-III (Consol. with Nos. 39005-5-III, 39006-3-III,
39007-1-III, 39027-6-III, 39028-4-III)
*In re C.W.*

"A trial court's findings of fact in a termination proceeding will not be disturbed so long as they are supported by substantial evidence." *In re the Parental Rights of B.P. v. H.O.*, 186 Wn.2d 292, 313, 376 P.3d 350 (2016). "Substantial evidence is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." *In re Welfare of T.B.*, 150 Wn. App. 599, 607, 209 P.3d 497 (2009). Whether findings of fact are supported by substantial evidence is determined in light of the degree of proof required by the legal conclusion at issue. *In re Dependency of P.D.*, 58 Wn. App. 18, 25, 792 P.2d 159 (1990). Reviewing courts defer to the trial court's determinations on the weight of the evidence, witness credibility, and conflicting testimony. *In re Welfare of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). Unchallenged findings are verities on appeal. *Id.*

Whether findings of fact support conclusions of law is reviewed de novo. *In re Parental Rights of K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016).

2.     WHETHER NECESSARY SERVICES WERE OFFERED OR PROVIDED TO THE PARENTS

Both the father and the mother contend that the Department failed to understandably offer and provide all necessary services. We disagree.

Washington law requires the Department to provide or offer both the father and the mother "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). A

20

"necessary service" is one that is required to address a condition preventing reunification of the parent and child. *I.M.-M.*, 196 Wn. App. at 921. "The inquiry is not limited to services ordered by the court during the dependency, but rather the Department must show it offered all necessary available services." *Id.*

"A service is 'necessary' if it is needed to address a condition that precludes reunification of the parent and child." *Id.* Fulfillment of its statutory obligation requires the Department to, at the least, "provide a parent with a list of referral agencies that provide those services." *In re Dependency of D.A.*, 124 Wn. App. 644, 651, 102 P.3d 847 (2004). If a claim is based on the Department's alleged failure to provide a service, "termination is appropriate if the service would not have remedied the parental deficiency in the foreseeable future." *In re Parental Rights of D.H.*, 195 Wn.2d 710, 719, 464 P.3d 215 (2020).

The statute also requires the Department to demonstrate that it tailored those services to the father and the mother's individual needs. *I.M.-M.*, 196 Wn. App. at 921. Where a parent presents with both mental health and chemical dependency conditions, the Department must provide "integrated services." *Id*. at 922.

A. *Mother*[5]

---

[5] The mother fails to assign error to any of the trial court's findings of fact or conclusions of law in her briefing under either of the issues. *See* RAP 10.3(g).

No. 39004-7-III (Consol. with Nos. 39005-5-III, 39006-3-III,
39007-1-III, 39027-6-III, 39028-4-III)
*In re C.W.*

The mother argues that the Department failed to provide or offer all necessary

services because it failed to facilitate reunification with her children. As a result, the

mother was unable to complete the court-ordered family therapy, parenting assessment,

and evidence-based parenting program. The record supports the trial court's conclusion

that the Department provided or offered all necessary services and the services that

required contact with her children were not reasonably available.

Washington courts have held that "visitation" on its own is not a service that must

be provided under RCW 13.34.180(1)(d). *In re Dependency of T.H.*, 139 Wn. App. 784,

792, 162 P.3d 1141 (2007). An appeal of a termination order is not a proper time to

argue that trial court orders precluded visitation. *Id.* However, visitation may be part of

a service like an interactive parenting class.

The dependency statute states that "[v]isitation is the right of the family" where

visitation is in the best interests of the child and emphasized that visitation is essential for

maintaining the parent-child relationship and making reunification possible. RCW

13.34.136(2)(b)(ii)(A). Where it is in the best interest of the child, the Department must

encourage the maximum parent contact possible. *Id.* However, visitation may be limited

or denied where the court "determines that such limitation or denial is necessary to

protect the child's health, safety, or welfare." RCW 13.34.136(2)(b)(ii)(C). Moreover,

> [w]hen a parent or sibling has been identified as a suspect in an active
> criminal investigation for a violent crime that, if the allegations are true,

22

> would impact the safety of the child, the department shall make a concerted effort to consult with the assigned law enforcement officer in the criminal case before recommending any changes in parent/child or child/sibling contact. In the event that the law enforcement officer has information pertaining to the criminal case that may have serious implications for child safety or well-being, the law enforcement officer shall provide this information to the department during the consultation.

*Id.* However, the Department may only use the information from law enforcement to inform its decision-making on visitation, and it may not share the information. *Id.*

Here, in addition to an ongoing law enforcement investigation during at least part of the dependency, Labish testified that the children's providers advised that until the parents were willing to admit how they had traumatized the children, resumption of contact would not be in the children's best interest. Because this was the recommendation of the providers throughout the case, the Department did not request that visitation be resumed. And throughout the dependency case, given the numerous allegations, the trial court found that visitation should not be resumed. Although it is unclear whether RC and DC were seeing providers during the entirety of the dependency, they did both express that they did not wish to have contact with their parents.

The Department was required to encourage parent visitation to the maximum extent possible where it is in the best interests of a child. However, the court may limit or deny visitation where such action is necessary to protect a child's health, safety, or welfare and such was the case here. The mother does not argue that it was in the

children's best interest to resume visitation, nor does she claim that the trial court abused

its discretion in continuing to suspend visitation. Rather, she suggests that, despite the

recommendations of the children's providers and the trial court's decision, the

Department should have advocated for visitation because visitation was required for her

to complete certain court-ordered services. In order for the mother to engage in the

services recommended by the Department, she needed to first take steps that would make

it safe for her children to reengage in visitation, including addressing her own trauma

through individual mental health treatment. She failed to engage in these services in a

meaningful way. Because the evidence shows that visitation was not in the children's

best interest, the services dependent upon reunification were not "reasonably available."

The mother contends that the Department's position is undermined by the fact

that, upon DC's request, the Department sought an order permitting therapeutic contact

between the mother and DC. The mother does not explain her argument or support her

contention that it was the Department that sought the order permitting visitation with

DC.[6] The trial court's order states that it was granting the mother's request for visitation,

not the Department's. Accordingly, this argument fails.

---

[6] This court will not "scour the record and construct arguments for counsel." *In re Disciplinary Proceeding Against Whitney*, 155 Wn.2d 451, 467, 120 P.3d 550 (2005).

On appeal, the mother also maintains that the Department failed to facilitate the necessary services during the time period when she did have contact with her children. Although she does not explicitly argue it, it appears she is claiming that, during the two months where she had visitation with DC, the Department should have re-referred her for family therapy, a parenting assessment, and an evidence-based parenting program. Assuming this is the mother's position, this argument only applies to the termination of the mother's parental rights with regard to DC. The mother did not raise this challenge at trial so the facts are undeveloped. *See* RAP 2.5(a). Even so, providing services in such a short time span would be futile.

"'Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services.'" *K.M.M.*, 186 Wn.2d at 483 (quoting *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.2, 225 P.3d 953 (2010)) (internal quotation marks omitted). "The provision of services is futile where a parent is unwilling or unable to participate in a reasonably available service that has been offered or provided." *Id*.

In *K.M.M.*, the court determined that the provision of attachment and bonding services to K.M.M.'s father would have been futile because K.M.M. "could not tolerate interactions with her father and refused to attend visitation." *Id*. Further, the additional services would have also been futile because the father failed to show empathy for

25

K.M.M.'s needs: he failed to recognize his own parenting deficiencies and blamed the Department, foster parents, K.M.M.'s therapist, and his own therapist for his failure to reunify with K.M.M. *Id.* at 484. Additionally, as the father had failed to address his own mental health issues, he was not ready to support K.M.M.'s attachment. *Id.* at 485. The court also noted that there was no evidence that attachment and bonding services would have repaired the parent-child relationship but rather the evidence tended to show that the relationship was irreparable and any reunification attempt would be detrimental to K.M.M. *Id.* at 484.

Here, like *K.M.M.*, even had the Department re-referred the mother for family therapy, a parenting assessment, and an evidence-based parenting program during the short period where she resumed contact with DC, the provision of these services would have been futile because the mother still would not have addressed her underlying trauma that prevented her from safely parenting her children and realizing her own parenting deficiencies. The mother showed a lack of awareness of her own deficiencies when she expressed that parenting five children was easy and she did not have any issues with her children. Absent significant progress in her own mental health treatment, including becoming more aware of her own deficiencies, any services involving interacting with DC likely would have been ineffective.

In fact, with regard to family therapy specifically, the Department asked DC if he wished to engage in it after he resumed visitation with his mother, and he stated that he did not. Taylor's testimony also appeared to indicate that whether the mother proceeded with the evidence-based parenting program and the parenting assessment during visitation was at DC's discretion. Additionally, the mother points to no evidence showing that the additional parenting-related services would have repaired the mother's relationship with DC; rather, DC's request to stop visitation and stated belief that his mother had not made progress tended to show that the mother's relationship with DC was irreparable. Thus, the mother's argument that the Department should have re-referred the mother for parenting-related services when she resumed visitation with DC fails.

In sum, substantial evidence supported the trial court's finding that the Department offered or provided to the mother all necessary, reasonably available services capable of correcting her parental deficiencies.

### B. *Father*

The father maintains that the Department failed to offer or provide all necessary services because it did not offer or provide chemical dependency treatment and did not tailor services to provide him with a Christian mental health therapist. We disagree.

The trial court ordered, and the father agreed to participate in numerous services. To address concerns that the father may have a chemical dependency, the court ordered

UA/BA testing as recommended by treatment providers or upon reasonable suspicion by the social workers. Throughout the course of the dependency, the father's participation in services and contact with the social worker were minimal. The father did not appear for the termination trial and did not present any evidence.

On appeal, the father maintains that the Department did not provide chemical dependency services and did not investigate his need for chemical dependency treatment. Initially, the father argues that the Department failed to provide him with chemical dependency services. He points out that while testing was ordered on an as-needed basis, no testing was ever offered. To this extent, he contends that the trial court finding that he had participated in two UA/BA tests that had come back clean is not supported by substantial evidence.

The father is correct that the testimony and evidence at trial showed that no UA/BA testing had been ordered throughout the course of the dependency, and therefore the trial court's finding was an error as it was not supported by substantial evidence. However, as this finding by the trial court was in the father's favor and the trial court ultimately did not find that the father was unfit due to chemical dependency, the erroneous finding did not materially affect the trial court's decision. Thus, this error did not impact the outcome of the proceedings and was harmless. *See State v. Caldera*, 66

No. 39004-7-III (Consol. with Nos. 39005-5-III, 39006-3-III,
39007-1-III, 39027-6-III, 39028-4-III)
*In re C.W.*

Wn. App. 548, 551, 832 P.2d 139 (1992) ("[A]n erroneous finding of fact not materially affecting the conclusions of law is not prejudicial and does not warrant a reversal.").

The father contends that chemical testing was never offered. While this is true, the testing ordered by the court and agreed to by the father was conditioned upon the recommendation of treatment providers or requested by the social workers. The trial court found that the father's contact with treatment providers and the social worker was minimal. There is no evidence that the treatment providers or social workers ever had reason to recommend or request testing.

The father also argues that the Department was required to "investigate" his chemical dependency, relying on *In re I.M.-M.*, 196 Wn. App. 914, 385 P.3d 268 (2016). In *I.M.-M.*, the mother promptly completed a psychological evaluation that identified her cognitive impairments and found that she may struggle with traditional therapy. Although the Department was provided with the evaluation, the Department failed to investigate the identified needs, failed to address those needs in further evaluations and treatment, and failed to provid tailored services. *Id*. at 923. In contrast to *I.M.-M.*, there is no evidence that the father's chemical dependency was likely to impact his ability to address other parental deficiencies nor is there any evidence that services other than testing were needed.

29

Moreover, as the Department points out, the father's focus on chemical dependency services is a red herring. The trial court did not terminate the father's parental rights based on chemical dependency deficiencies. Instead, the court found that the father failed to address his parental deficiencies of "physical abuse, sexual abuse, and chronic neglect." CP at 2475.

The father also maintains that the Department failed to offer and provide all necessary services when it did not refer him to a Christian mental health counselor. He argues that he had a constitutional right for a referral to a Christian counselor and maintains that the fact that he attended two sessions with Hall, a Christian counselor, in 2018 demonstrates that he would have been more amenable to mental health services had the Department referred him to a Christian counselor. The Department responds that it did not prohibit the father from using a Christian counselor, made attempts to find Christian counselors, but in the end the father was unwilling to work with any treatment provider connected to the Department.

The father claims that the Department violated his right to freedom of religion under the First Amendment and the Washington Constitution by failing to refer him to a Christian counselor. The father claims that because the Department *could have* asked counselors their religion prior to contracting with them, it was *required* to do so under the First Amendment and the Washington Constitution. He points out that the Department

inquiring of a counselor's religious affiliation would not have violated freedom of religion, and from there concludes that they were accordingly required to provide him with a Christian counselor.

This issue was not raised before the trial court and therefore the factual basis for this claim has not been developed. Generally, issues raised for the first time on appeal will not be considered unless the appellant demonstrates it is a "manifest error affecting a constitutional right," under RAP 2.5(a)(3). The father does not make such a claim and the lack of a record makes it difficult to consider this issue. For example, there is no evidence in the record showing that there was even a Christian provider to which the Department could have referred the father. Accordingly, we decline to address this issue. *See* RAP 2.5; *State v. Mashek*, 177 Wn. App. 749, 764, 312 P.3d 774 (2013) (argument on appeal is waived where defendant failed to raise it before the trial court and provides no argument on appeal that any exception to the general waiver rule applies).

The record demonstrates that the Department made efforts to accommodate the father's request for a Christian mental health counselor. While the Department was not permitted to ask counselors their religion prior to contracting with them, when sending out referrals for mental health providers in this case, the Department explicitly noted the parents' preference for a Christian counselor. Social worker Labish also searched online for counselors who self-identified as Christian. At one point, the Department provided a

referral to Colson, with whom the father had worked with previously, and while the father appeared for the initial intake, he refused to participate in the evaluation or any subsequent services.

The evidence suggests that the father's refusal to participate in mental health treatment was not based on his preference for a Christian counselor, but rather on his insistence "that he didn't want to work with any provider that was connected with the department whatsoever." RP at 89. There is substantial evidence to support the trial court's findings that the Department offered or provided all necessary services reasonably available with regard to both the mother and the father.

3.    LIKELIHOOD OF DEFICIENCIES BEING REMEDIED IN THE NEAR FUTURE

Both parents argue that the trial court erred in finding that there was little likelihood that conditions would be remedied so that the children could be returned to the parents in the near future.

Prior to terminating parental rights, the Department is required to show that "A parent's failure to substantially improve parental deficiencies within 12 months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). "A parent's unwillingness to avail [themselves] of remedial services within a reasonable period is highly relevant to a trial

court's determination as to whether the State has satisfied RCW 13.34.180(1)(e)." *In re Welfare of T.B.*, 150 Wn. App. at 608.

Although the Department retains the burden of proof, the rebuttal presumption shifts the burden of production to the parent to show evidence of improvement. *In re Welfare of C.B.*, 134 Wn. App. 942, 955-56, 143 P.3d 846 (2006). "When it is eventually possible, but not imminent, for a parent to be reunited with a child, the child's present need for stability and permanence is more important and can justify termination." *Id*. at 958-59.

The interpretation of "near future" is dependent on "the age of the child and the circumstances of the child's placement." *Id*. at 954. The "near future" is typically a shorter period for children that are younger. *Id.*

A. *Mother*

The mother maintains that the trial court erred in finding that there was little likelihood that her deficiencies will be remedied in the foreseeable future because the mother was compliant with available treatment and had shown improvement over the term of the dependency.

The rebuttal presumption applies to this case. Therefore, the burden of production shifted to the mother to show evidence of improvement. Although the mother engaged in most of the services provided by the Department, she fails to overcome the presumption.

The evidence demonstrates that the mother submitted to both UAs requested by the Department, completed the psychosexual evaluation, participated in family therapy as long as it was provided, and submitted to a chemical dependency evaluation. However, the mother failed to regularly engage and make progress with counseling and did not address her own childhood trauma or how to keep her children safe from abuse. From the end of 2018 to 2019, prior to the dependency order, the mother saw Del Carlo for counseling for three months and had "partial improvement" during her time there but made "minimal progress" toward her goals of learning coping skills and addressing her anxiety. RP at 212, 217. At some point, potentially within the twelve-month period, the mother also engaged with Hall for counseling but just completed two sessions before Hall terminated the relationship. There was no evidence of any progress made by the mother during these sessions.

After the twelve-month period, although she was unable to finish the evidence-based parenting program due to visitation being suspended with her children, the mother did complete the portions that she could finish on her own. Similarly, the mother was unable to complete the parenting assessment due to her lack of contact with her children. And the provider who administered the portions of the parenting program expressed concern with the mother's lack of insight into her parenting and that the mother believed that parenting five children was easy.

34

After she saw Hall, the mother did not engage with another mental health provider until two months prior to the termination trial when she started seeing Toews for counseling to deal with anxiety and depression. Though Toews noted that the mother was moving ahead, she indicated that she was still in the beginning stages of addressing her anxiety and depression—specifically, the mother was still addressing her denial—and Toews could not provide an estimate on how long it would take for the mother to progress. Although Toews did not identify any safety concerns with regard to the children being placed in her care, Toews also said she did not have enough information to make that determination. Further, there was no evidence that the mother addressed the recommended areas of treatment with Toews, which were her history of abuse and neglect and how to protect her children from abuse or neglect.

Although the evidence showed that the mother engaged with many of her services throughout the dependency, there was substantial evidence that she failed to make progress toward remedying the parental deficiencies that had initially resulted in the dependency. She failed to even begin to address issues that led to the underlying dependency: lack of appropriate supervision and failure to protect. Even though the trial court found, and the evidence supports, that the mother did make some progress, it was not enough to allow the children to be returned to her in the foreseeable future. Further, all of the children stated that they do not wish to be reunited with their mother, and AW

and CW were placed into a permanent adoptive home in which they expressed a desire to stay.

Relying on *C.B.*, the mother maintains that she has overcome the rebuttal presumption by completing a chemical dependency program and having recent positive visitation with DC. In *C.B.*, the mother made significant progress in the four months prior to the termination hearing: she completed chemical dependency programs, presented evidence of change from her counselors and friends, was scheduled to begin an anger management course, and had positive visitation with her children. 134 Wn. App. at 949, 954-55, 957. There was no evidence demonstrating how long it would take the mother to reunify with her child. *Id.* at 959.

In contrast, here, apart from her completion of the chemical dependency program in 2018, the mother has made little to no progress in addressing her parenting deficiencies. Moreover, although the visits with DC initially went well, they actually tend to support the Department's position because after a couple months DC asked to stop visits as he believed that the mother had taken substances prior to a visit and was not making progress.

The mother contends that the mere fact that she participated in court-ordered services demonstrated improvement. However, improvement requires that parent to improve the parental deficiencies that resulted in the dependency. Participating in

36

services alone does not necessitate a finding of improvement. The parent must also benefit from those services, and there was little evidence that the mother benefited from her participation in services.

The mother also appears to argue that the results of the psychosexual evaluation showed that she was unlikely to predate the children sexually and that she was likely being honest about her lack of involvement in any sexual abuse of the children that may have occurred. She claims that the evaluation results, taken along with the varied accounts of abuse from the children and the fact that criminal charges were never brought, demonstrate that there was no basis for the trial court's finding of a parental deficiency with regard to sexual abuse. However, the psychosexual evaluation did not look at whether the mother committed a sex offense or sexual deviancy but instead looked at amenability to treatment.

The mother further claims that the abuse allegations, specifically with regard to her involvement, were not credible. She notes that some of the reported touching involved non sexual activities, CW and AW who reported the mother was involved were younger and CW has memory and cognition issues, and the psychosexual evaluation indicated no deception. However, this court defers to the trial court with regard to credibility determinations. *See A.W.*, 182 Wn.2d at 711. The children's accounts were not necessarily false because some of the alleged incidents of abuse could have been non-

sexual touching such as checking to see if a child had wet his bed. And their cognitive issues did not completely discredit their accounts. These were rather both credibility factors for the trial court to consider. The same applies to the polygraph results. Moreover, the evaluator did not explain what portions of the evaluation the "[n]o deception was indicated" result applied to, and as explained above, the focus of the evaluation was not whether the mother had perpetrated sexual abuse but whether she was amendable to treatment.

### B. Father

The father argues that because the services were inadequate, the trial court erred in finding that there was little likelihood of conditions remedying in the near future as such a finding was premature and contrary to evidence presented at trial. He claims that he did participate in some services and likely would have been more successful had he been provided the integrated service of chemical dependency treatment as well as therapy tailored to his needs. However, as explained above, the provision of further services to the father would have been futile, and the Department was not required to provide integrated services to the father. Accordingly, this argument fails.

The father also maintains that substantial evidence does not support the trial court's finding that he "never engaged in mental health treatment or individual counseling during the life of the case." CP at 2473. He points out that he did engage in

mental health treatment with Hall until she terminated the two sessions. The testimony at trial did establish that the father attended counseling with the mother for two sessions before Hall terminated the relationship. Therefore, the trial court did err in this finding. However, the testimony established that he only attended two sessions with Hall and there was no evidence of any progress toward addressing the father's parental deficiencies during these two sessions. Thus, even if the trial court's findings had correctly noted the two sessions with Hall, this would not have impacted its decision. Accordingly, the error was harmless. *See In re Dependency of A.C.*, 1 Wn.3d 186, 193-94, 525 P.3d 177 (2023).

The father further contends that substantial evidence does not support the trial court's finding that he "demonstrated through his own inactions and omissions that he is unwilling or unable to make use of the services provided by the Department" and "demonstrated through a lack of engagement in court ordered services over the course of three years that he is unwilling to engage in any services designed to remediate the identified parental deficiencies." CP at 2474. The father claims that he participated in some services and would have participated in more had the trial court tailored his needs with a Christian counselor. But the trial court did not find that the father did not engage in *any* services, rather it found a lack of engagement. And this finding of a lack of engagement was supported by substantial evidence, as explained above, as the father

No. 39004-7-III (Consol. with Nos. 39005-5-III, 39006-3-III,
39007-1-III, 39027-6-III, 39028-4-III)
*In re C.W.*

consistently declined to complete the psychosexual evaluation and participate in

counseling despite repeated efforts by the Department to encourage him to engage with

the services provided.[7]

Substantial evidence supported the trial court's finding that there was little

likelihood that conditions would be remedied so that the children could be returned to

either parent in the near future.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
        Staab, J.

WE CONCUR:

_____
Lawrence-Berrey, A.C.J.

_____
Pennell, J.

---

[7] The father also argues that the trial court erred in finding that his failure to appear at the termination trial made it clear that he had no interest in changing so that either child could return home in the near future, but he fails to provide argument in support of this contention. Accordingly, we decline to address this argument.

40