IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| In the Matter of the Dependency of P.L.C.S., | No. 85457-7 |
| A minor child. | UNPUBLISHED OPINION |

BOWMAN, J. — J.S. appeals from an order terminating his parental rights to P.L.C.S. He argues the trial court erred by finding that the Department of Children, Youth, and Families (Department) offered or provided J.S. all necessary services reasonably available and capable of correcting his parental deficiencies, that J.S. is unlikely to remedy his parental deficiencies in the near future, and that J.S. is currently unfit to parent. He also argues the court erred by concluding termination is in P.L.C.S.'s best interests. We affirm.

FACTS

P.L.C.S. was born in June 2019 to mother C.J. and father J.S. Shortly after his birth, hospital staff reported concerns about the parents' ability to care for P.L.C.S. to the Department. For example, C.J. did not receive prenatal care until the week before giving birth to P.L.C.S., and she tested positive for methamphetamines at that appointment. When C.J. arrived at the hospital to deliver P.L.C.S., her "overall condition was 'filthy' " and she tested positive for

cannabis.[1]  As to J.S., a hospital nurse reported that when he came to the hospital, he also appeared to be "very dirty" with "poor dentation."  J.S. nodded off while holding P.L.C.S. and nearly dropped him, but the nurse caught P.L.C.S. "before [he] could hit the floor."

At a family team decision meeting (FTDM) on July 1, J.S. stated that he was about five years clean from methamphetamines and that he and C.J. lived with his parents.  But later the same day during a private interview, J.S. said that he had been "clean" for only three months.  He also admitted that he had been homeless for about four years because his mother kicked him out of the house and that he and C.J. were living in a tent.  C.J. also said they were currently living in a tent.  When a social worker contacted C.J.'s sister and nephew[2] about housing, the nephew said that C.J. and J.S. could not live with them because of their "drug use and past behaviors."  J.S. agreed to submit to random urinalysis (UA) testing but did not follow through.

On July 3, 2019, the Department petitioned for dependency of P.L.C.S., alleging he had no parent, guardian, or custodian able to care for him.  The petition alleged that because of the parents' drug use, inability to properly care for P.L.C.S., and lack of a safe and sanitary living space, it "would not be safe for him to be in the care of his parents at this time."  On July 9, the court held a contested shelter care hearing and ordered the Department to place P.L.C.S. out of the home.

---

[1] P.L.C.S. tested negative for cannabis.

[2] C.J.'s sister T.S. has custody of C.J.'s two older children.  T.S.'s adult son, his girlfriend, and their one-year-old child also live with T.S.

On July 27, 2020, the court held a dependency hearing.  J.S. appeared at the hearing and agreed to the facts establishing dependency.  Specifically, he agreed that he appeared disheveled at the hospital and nodded off while holding the baby.  He also agreed that he gave conflicting information about his drug use and that he and C.J. were not allowed to live with his parents or C.J.'s sister and nephew because of their drug use.  And he agreed that he never received substance use treatment, had been homeless for about four years, and was living in a tent.  Finally, he agreed that it would be unsafe for P.L.C.S. to be in his care "at this time" and that "[i]t is currently contrary to [P.L.C.S.]'s welfare to return home" because "there is no parent or guardian available to care" for him.

At the end of the hearing, the trial court found P.L.C.S. dependent.  It ordered that P.L.C.S. be placed with relative K.S. and that J.S. have supervised visitation at least three times each week for two hours.  Soon after, the Department placed P.L.C.S. with relatives D.S. and S.S.[3]

In January 2021, the court held a disposition hearing to determine the services necessary to address J.S.'s parenting deficiencies.  The court found there was "sufficient evidence that [J.S.'s] alleged substance abuse necessitates further assessment."  It ordered J.S. to complete a drug and alcohol evaluation, submit to weekly random UA testing for alcohol and cannabis for 90 days, complete a parenting assessment, and comply with any recommended services.

---

[3] In August 2020, the court entered a default dependency order as to C.J.

Throughout 2021, J.S. participated in most of the scheduled visits with P.L.C.S.  And at a review hearing in November 2021, the court changed J.S.'s visitation with P.L.C.S. from supervised to unsupervised.  But he did not engage in any services except for one appointment related to his parenting assessment.  So, in February 2022, the Department petitioned for termination of J.S.'s parental rights to P.L.C.S under RCW 13.34.180 to .210.[4]

In March and April 2023, the court held a fact-finding hearing on the termination petition as to J.S.  At the hearing, the court considered the testimony of Department social worker Matthew Lang, court appointed special advocate (CASA) Rischel Voigt, P.L.C.S.'s  caregivers D.S. and S.S., a visitation specialist, a drug and alcohol counselor from A Walk to Freedom Counseling, and J.S.

Social worker Lang testified to the Department's efforts to support J.S. in engaging with court ordered services, finding housing, and visiting P.L.C.S.  Lang said he tried to engage J.S. with service providers "at least once a month" by "sending service letters, sending e[-]mails, [and] trying to meet [J.S.]" in person.  Still, J.S. did not maintain regular contact with the Department and did not engage in the court ordered services.

As for housing, Lang said he tried to provide J.S. assistance through a federal Family Unification Program (FUP) housing voucher and coordinated Zoom meetings with Catholic Community Services (CCS), which accepted the voucher and could help J.S. get housing.  But J.S. failed to follow-up on the

---

[4] In June 2022, the trial court terminated C.J.'s parental rights to P.L.C.S. by default.

4

voucher and did not attend most Zoom meetings. As a result, the voucher expired.

When asked about J.S.'s visits with P.L.C.S., Lang testified J.S. is "appropriate with his son." But Lang also said the visits did not happen "regularly" because J.S. "no-shows" about once or twice every two weeks. Lang opined that J.S. was unfit to parent and that this could not be remedied such that P.L.C.S. could return to J.S. in the near future. Lang estimated the "near future" for P.L.C.S. was three to six months "because the child is only [three] years old."

CASA Voigt testified that she supported the Department's petition to terminate J.S.'s parental rights. Voigt explained that when she tries talking to P.L.C.S. about his visits with J.S., he "closes up," but he "gets very enthusiastic when visits are canceled." Voigt also said she had concerns about P.L.C.S.'s safety during his visits with J.S. For example, she testified about a visit where P.L.C.S. told her that J.S. would not wake up, an ambulance took him away, and P.L.C.S. remained with an unfamiliar adult. It was her opinion that because J.S. has failed to address his parental deficiencies for several years—"all of [P.L.C.S.'s] life"—he would not overcome them in the near future.

P.L.C.S.'s caregivers also testified that visitation days with J.S. are difficult for him. S.S. said P.L.C.S. appears "overwhelmed" on visit days and "becomes irritated about smaller things that normally wouldn't bother him." She also said that he typically has "outbursts" the mornings before visits. D.S. also testified that P.L.C.S.'s "mood deteriorates" on visit days and that when they tell P.L.C.S. he does not have a visit, he is "super happy."

5

J.S. testified he was living in a tent and unemployed and conceded he had not engaged in any court ordered services except for one parenting assessment meeting. He insisted that he engaged in "no drug use at all," so there was "no need" to submit to UA testing. J.S. said that the Department provided him a phone, transportation assistance, and a car seat but did not offer him housing services. According to J.S., the FUP voucher was in C.J.'s name and he "couldn't do anything on the . . . voucher without her." Still, J.S. testified that he was "[a]bsolutely" able to safely parent P.L.C.S. and that "[h]ousing is the only thing keeping me from my son."

In May 2023, the trial court terminated J.S.'s parental rights. The court found that the Department proved the requisite elements under RCW 13.34.180 and .190 and that termination was in P.L.C.S.'s best interest.

J.S. appeals.

## ANALYSIS

J.S. argues that substantial evidence does not support several of the trial court's findings that the Department offered or provided him all necessary services under RCW 13.34.180(1)(d), that he is unlikely to remedy his parental deficiencies under RCW 13.34.180(1)(e),[5] and that he is unfit to parent. He also argues the court erred by concluding termination is in P.L.C.S.'s best interests.[6] We disagree.

---

[5] J.S. does not dispute that the Department proved elements (a), (b), (c), and (f) under RCW 13.34.180(1).

[6] J.S. challenges the trial court's findings of fact 2.6, 2.8, 2.10, 2.11, 2.12, 2.13, 2.14, 2.15, 2.18, 2.19, 2.20, 2.22.1, 2.23, 2.25, 2.26, 2.27, 2.28, and 2.29, as well as conclusions of law 3.2, 3.3, 3.6, 3.7, 3.8, 3.9, and 3.10. We do not address challenged findings or conclusions that would not change the outcome of J.S.'s appeal.

1.  Standard of Review

In a proceeding to terminate parental rights where the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the court's findings of fact and whether those findings support the court's conclusions of law. *In re Dependency of P.D.*, 58 Wn. App. 18, 25, 792 P.2d 159 (1990). Substantial evidence is evidence sufficient "to persuade a fair-minded, rational person" of a premise's truth. *In re Welfare of T.B.*, 150 Wn. App. 599, 607, 209 P.3d 497 (2009).

We will not disturb the trial court's findings unless there is no clear, cogent, and convincing evidence in the record. *In re Parental Rights to D.H.*, 195 Wn.2d 710, 718, 464 P.3d 215 (2020). Evidence is clear, cogent, and convincing if it shows that the ultimate fact at issue is " 'highly probable.' " *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995)[7] (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 513 P.2d 831 (1973)). In determining whether there is substantial evidence to support the trial court's findings, we do not reweigh the evidence or the witnesses' credibility. *In re Dependency of E.L.F.*, 117 Wn. App. 241, 245, 70 P.3d 163 (2003). The trial court's unchallenged findings are verities on appeal. *In re Dependency of J.A.F.*, 168 Wn. App. 653, 667, 278 P.3d 673 (2012).

To terminate parental rights, the Department must satisfy a two-pronged test. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576, 257 P.3d 522 (2011). First, it must prove the six statutory elements under RCW 13.34.180(1) by clear,

---

[7] Internal quotation marks omitted.

7

cogent, and convincing evidence. RCW 13.34.190(1)(a)(i); *K.N.J.*, 171 Wn.2d at 576-77. Second, it must show by a preponderance of the evidence that termination is in the child's best interests. RCW 13.34.190(1)(b); *In re Welfare of C.B.*, 134 Wn. App. 942, 952, 143 P.3d 846 (2006).

The six statutory elements the Department must prove are:

> (a)  That the child has been found to be a dependent child;
> (b)  That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c)  That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d)  That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e)  That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . . [A]nd
> (f)  That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1).

2.  Necessary Services Offered—RCW 13.34.180(1)(d)

J.S. argues that the Department failed to show it offered or provided him all necessary services. In particular, he claims that "[h]omelessness was the primary reason for [P.L.C.S.]'s foster placement" and that the Department failed to provide adequate housing assistance. The Department contends substantial evidence supports the trial court's findings that it offered all necessary services. We agree with the Department.

Under RCW 13.34.180(1)(d), the Department must offer or provide services capable of correcting parental deficiencies within the foreseeable future. To satisfy this requirement, the Department must "affirmatively offer or provide necessary services." *In re Welfare of Hall*, 99 Wn.2d 842, 850, 664 P.2d 1245 (1983). A "necessary service" is one " 'needed to address a condition that precludes reunification of the parent and child.' " *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 480, 379 P.3d 75 (2016) (quoting *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014)). At a minimum, the Department must provide the parent with a referral list of service providers. *Hall*, 99 Wn.2d at 850. But when a parent is unwilling or unable to use the services provided, the Department need not offer additional services. *In re Dependency of S.M.H.*, 128 Wn. App. 45, 54, 115 P.3d 990 (2005).

Here, the court concluded that "[a]ll necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future, have been expressly and understandably offered or provided to [J.S.]." With regard to housing services, it found that the Department and a CCS representative met with J.S. and provided him information for housing resources. Specifically, it found the Department provided J.S. an FUP voucher accepted by CCS but he "failed to follow through in securing housing."

J.S. challenges the court's findings that he did not try to use the FUP voucher. According to J.S., the evidence is unclear about what happened with it. But substantial evidence supports the court's findings that the Department offered J.S. an FUP voucher and that he failed to secure housing.

The Department's case notes show that beginning in January 2021, it tried repeatedly to contact J.S. about completing the FUP voucher but he was often nonresponsive. Social worker Lang testified that ultimately, the Department submitted at least two FUP vouchers for J.S. and C.J. and CCS accepted one of them.[8] Lang then followed up with CCS and coordinated Zoom meetings where he, a CCS representative, J.S., and C.J. could discuss housing progress. But Lang testified that J.S. was present for only two of the approximate six to eight Zoom meetings.

And while J.S. identified two apartment complexes of interest, he never provided the Department contact information for the apartments, application information, or application payment information so the Department could cover the costs. Lang said he tried to follow up with J.S. about the FUP voucher several times but it eventually expired. Lang added that during in-person meetings with J.S., he discussed the FUP voucher, the state resource hotline 211, and whether J.S. needed "any other kind of housing help or any other kind of resource help."

Pointing to his own testimony, J.S. argues that CCS "refused to help him" with housing assistance and that Lang "never even sent . . . referrals or housing resources." But Lang's testimony contradicted these assertions. And the trial court found Lang's testimony credible and J.S.'s not. Again, we "defer to the trial

---

[8] Although the FUP issued the voucher in C.J.'s name, the evidence shows that the Department sought to provide housing through the voucher for both C.J. and J.S. and that CCS tried to help J.S. find housing using the voucher even when C.J. was nonresponsive.

court's weighing of the evidence and witness credibility determinations." *In re Parental Rights to D.H.*, 195 Wn.2d 710, 718, 464 P.3d 215 (2020).

Substantial evidence supports the court's determination that the Department offered J.S. all necessary services to remedy his parental deficiencies.

3. Likelihood of Remedying Deficiencies—RCW 13.34.180(1)(e)

J.S. argues that the Department did not show he was unlikely to remedy his parental deficiencies and care for P.L.C.S. in the near future. We disagree.

Under RCW 13.34.180(1)(e), the Department must show "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." The focus here "is on whether parenting deficiencies have been corrected." *In re Welfare of E.D.*, 195 Wn. App. 673, 689, 381 P.3d 1230 (2016). And what constitutes the "near future" depends on the child's age and the circumstances of his placement. *C.B.*, 134 Wn. App. at 954.

To determine whether conditions are likely to be remedied in the near future, the court may consider a parent's compliance with services and their parenting history. *E.D.*, 195 Wn. App. at 689. Where the Department clearly offered all necessary services and a parent fails to substantially improve their parental deficiencies within 12 months of the dispositional order, there is a rebuttable presumption of little likelihood that the parent will remedy those deficiencies in the near future. RCW 13.34.180(1)(e). And when it is "eventually possible, but not imminent, for a parent to be reunited with a child," the child's

"need for stability and permanence" can justify termination. *C.B.*, 134 Wn. App. at 958-59.

Here, the trial court identified J.S.'s parental deficiencies, including his history of substance abuse, housing instability, and inadequate parenting skills, and found that he "has failed to substantially improve [his] parental deficiencies in the 24 months following the entry of the disposition order." It found that J.S. "has demonstrated a lack of engagement with service providers despite the reasonable efforts of the Department." Specifically, he "did not participate in a drug and alcohol evaluation, nor has he completed 90 days of consistent negative UAs." And it found that J.S. "has not made any changes to his behaviors or exhibited any behaviors to demonstrate his ability to care for [P.L.C.S.]." Finally, the court found that P.L.C.S.'s "near future" is measured in weeks to months and that "there is little likelihood that conditions will be remedied so that the child can be returned to the father in the near future." Substantial evidence supports these findings.

Still, J.S. challenges the court's findings that there is little likelihood he could care for P.L.C.S. in the near future, arguing that he had no parental deficiencies to remedy except to secure "safe and stable housing." He argues that he "demonstrated good parenting during visits" and "has no documented substance use issue." And he asserts that under *In re Interest of S.G.*, "[t]he failure to engage in services is not a parental deficiency." 140 Wn. App. 461, 166 P.3d 802 (2007). His reliance on *S.G.* is misplaced.

In *S.G.*, we reversed a termination order because the department "required that the dependent child's father participate in services to address parental deficiencies without first proving any deficiencies." 140 Wn. App. at 463-64. In that case, the court found the child dependent based on only the mother's parental deficiencies. *Id.* at 464. The court entered a disposition order requiring the mother to participate in several services, including drug and alcohol evaluations and follow-up treatment. *Id.* It then entered a default order of dependency against the father, imposing the same conditions on him as it did the mother. *Id.* at 465.

When the father later appeared in the proceedings, he requested the child live with him. *S.G.*, 140 Wn. App. at 465. The department did not identify whether the father had a substance use problem but still required him to participate in the same services as the mother. *Id.* The father began some services but did not complete them. *Id.* at 465-66. The department then petitioned for termination. *Id.* at 466. It argued that the father could not timely complete the court ordered services and that "it would cause anxiety for S.G. to wait one year for her father to complete the drug and alcohol services." *Id.* Although the trial court recognized that the department had identified " 'no specific parental deficiencies' " for the father, it terminated his parental rights. *Id.* at 466-67.

This case is not like *S.G.* Here, substantial evidence supports the court's findings that J.S. had substance use and parenting deficiencies that he failed to correct. The Department's dependency petition identified J.S.'s drug use as a

parental deficiency. It alleged that J.S admitted to using methamphetamines as recently as three months before P.L.C.S. was born. The Department also alleged that J.S. and C.J. could not live with J.S.'s parents or C.J.'s sister and nephew because of their "drug use and past behaviors." And it asserted that J.S. was unable "to properly care for [P.L.C.S.] while in the hospital." In the July 2020 dependency order, J.S. agreed to these facts and agreed they established it was unsafe and "contrary to [P.L.C.S.]'s welfare to return home."

Based on the documented parental deficiencies, the court entered a disposition order requiring J.S. to engage in a drug and alcohol evaluation, weekly random UA testing for 90 days, and a parenting assessment and to comply with any recommended services. And at trial, the court found that J.S. failed to engage in these services or otherwise correct his deficiencies. Unlike in *S.G.*, the trial court here identified J.S.'s parental deficiencies and required specific services to address those deficiencies before terminating his parental relationship.

The court's findings support its conclusion that J.S. is unlikely to remedy his deficiencies such that P.L.C.S. could be placed with him in the near future.

4. Parental Unfitness

J.S. also argues that the Department failed to show he was currently unfit to parent. We disagree.

Along with finding the Department satisfied the elements of RCW 13.34.180(1), due process protections require that the trial court make a finding of current parental unfitness before it can terminate parental rights. *K.M.M.*, 186

Wn.2d at 479.  The proper inquiry for parental unfitness "is whether the existing parental deficiencies, or other conditions, prevent the parent from providing for the child's basic health, welfare, and safety."  *Id.* at 493.  But "if all the requirements of RCW 13.34.180(1) have been met, there is an implied finding of parental unfitness."  *Id.* at 490.

Here, as discussed above, the Department met all the requirements of RCW 13.34.180(1).  J.S. did not challenge four of the six elements under the statute.  And although he challenged elements (d) and (e), substantial evidence supports the court's findings that the Department expressly offered J.S. all necessary services and that there was little likelihood J.S. would remedy his parental deficiencies in the near future.  For this reason, the record supports an implied finding of current parental unfitness.

As much as J.S. argues that a lack of evidence showing recent drug use and evidence of appropriate visits with P.L.C.S. overcome this implied finding of parental unfitness, he is incorrect.  J.S. agreed in the dependency proceedings that drug use was an issue preventing him from providing a safe home for P.L.C.S.  His refusal to participate in a drug and alcohol evaluation and UA testing to determine the nature and extent of his substance use does not remedy the issue.  And, while the evidence shows J.S. acted appropriately during visits with P.L.C.S., those visits alone do not amount to evidence that J.S. has the ability to provide for P.L.C.S.'s basic needs as a full-time parent.  Particularly when J.S. has never had P.L.C.S. for an overnight visit, much less cared for him for any extended period of time.

Substantial evidence supports the court's findings that J.S. was currently unfit to parent P.L.C.S.

5. Child's Best Interests

J.S. contends that the Department failed to prove termination was in P.L.C.S.'s best interests. Again, we disagree.

"Whether termination of a parent's rights is in a child's best interest is a highly fact dependent question." *In re Dependency of A.D.*, 193 Wn. App. 445, 459, 376 P.3d 1140 (2016). We give the trial court's best-interest determination great deference on review. *J.A.F.*, 168 Wn. App. at 669-70. A child has "the right to a safe, stable, and permanent home." RCW 13.34.020. And when a parent fails to rehabilitate over a long dependency period, the trial court is justified in finding that termination is in the child's best interests. *J.A.F.*, 168 Wn. App. at 670.

Here, the trial court found that throughout the dependency, J.S. "has demonstrated an unwillingness to participate in and/or successfully complete services offered to correct parental deficiencies." And it found that he "has not demonstrated the ability or the commitment to provide the child with a stable home currently and will not do so in the near future, despite the offer of remedial services." Further, it found that the CASA testified that termination was in P.L.C.S.'s best interests and that her testimony was "particularly credible." Substantial evidence supports these findings. And the findings support the trial court's conclusion that termination of the parental relationship between J.S. and P.L.C.S. is in P.L.C.S.'s best interests. Finally, J.S.'s argument that P.L.C.S. is

bonded to him does not negate the court's conclusion. *See In re Dependency of G.C.B.*, 28 Wn. App. 2d 157, 173-74, 535 P.3d 451 (2023) (parent-child bond is only one of many factors relevant to the child's best interests).

Because the record shows that the Department offered or provided J.S. all necessary services, that J.S. is unlikely to remedy his parental deficiencies in the near future, that he is currently unfit to parent, and that termination is in P.L.C.S.'s best interests, we affirm.

Brennan, J

WE CONCUR:

Birk, J.                          Coburn, J.

17